# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| ROBERT CARLOW | : | |
| JAMES PERRY | : | |
| WILLIAM PERRY and | : | |
| DAVID GORMAN | : | |
| | : | |
| -v.- | : | Civil Action 04- 325- S |
| | : | |
| STANLEY MRUK     and | : | |
| CONRAD BURNS in their personal and | : | |
| official capacities | : | |

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 (a), the Plaintiffs move for summary judgment against both defendants. In support thereof, Plaintiffs rely upon the memorandum and exhibits attached hereto.

Plaintiffs, by their attorney,

_____
GARY D. BERKOWITZ, ESQ. #2732
For the American Civil Liberties Union
Rhode Island Affiliate
One James Street
Providence, RI 02903
Tel: 751-7671        Fax: 751-1146

## CERTIFICATION

I certify that I mailed a copy of this statement to : George H. Rinaldi, Esq.  72 Pine Street, Providence, RI 02903 this 27 day of July, 2005.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| ROBERT CARLOW | : |
| JAMES PERRY | : |
| WILLIAM PERRY and | : |
| DAVID GORMAN | : |
| | : |
| -v.- | :   Civil Action 04- 325- S |
| | : |
| STANLEY MRUK   and | : |
| CONRAD BURNS in their personal and | : |
| official capacities | : |

### MEMORANDUM OF LAW IN SUPPORT OF SUMMARY JUDGMENT

<u>Factual Background:</u>   This action raises separate questions of law which the Court is capable of answering on the basis of the agreed- upon facts. These issues are therefor ripe for summary judgment. The Plaintiffs are all firefighters in the Anthony District, but not residents of the District, (see agreed statement of facts, based upon admitted allegations of the complaint). As such, they have had long- running issues with the management of the Fire District, which has been run by Defendant Stanley Mruk as chief since 1961.

At the December 9, 2003 meeting of the Fire District, the Plaintiffs were in attendance. Because they believed that the conduct of the annual financial meeting was not done in accordance with the law or the will of the voters, the Plaintiffs brought video cameras to the meeting for the purpose of taping it. (Complaint, ¶ 17). Defendant Burns announced that only the press would be able to record the meeting. (Defendant's answer, Minutes of the meeting, page 1).

Later, Plaintiff Gorman was removed from the meeting when he went to the soda machine, on the grounds of disrupting the meeting, (Complaint, ¶ 20 -22). Plaintiff Carlow is also president of the firefighters union, see Defendant's Answer, ¶ 1, and has previously prevailed in an action against Chief Mruk over free- speech issues in this Court (Carlow v. Mruk 02-538 -

ML). Carlow was threatened with removal from the meeting on the grounds of disruption when he got up to go the bathroom. Based upon discovery and the answer filed by the Defendants, the "disruption" to the meeting the Defendants cite is the possibility of the Plaintiffs (who are not voters in the financial fire district) would move into the section cordoned off for the voters and to speak or vote. Nothing in the Fire District by- laws closes the meetings to non- voters or prevents them speaking, only from voting.

QUESTIONS PRESENTED:

I. Was the order limiting audio or video recording of the meeting to members of the press constitutional?

II. Did the removal of Plaintiff Gorman, and threatened removal of Plaintiff Carlow violate their first amendment rights?

Discussion of the Law:

I. Was the order limiting audio or video recording of the meeting to members of the press constitutional?

This question is one of settled law. At his deposition, Defendant Burns testified that he was banning recording of the meeting by persons not in the press on the advice of legal advice he received from counsel that he declined to identify, citing privilege. The United States Supreme Court has stated several times (first in a case relating to trial coverage) that "The First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally. *Branzburg v. Hayes*, 408 U.S. 665, 684, 92 S.Ct 2646, 2658, 33 L. Ed. 2d 626 (1972). This was affirmed six years later "the press has no greater right to information about a trial superior to the general public..." *Nixon v. Warner Communications,* 435 U.S. 589 (1978). Since then, the rights of the press and the public to access and to record

proceedings have always been treated as equal. See *Newman v. Graddick*, 696 F.2d 796, (11th Cir., 1983). Although there is arguably no right to videotape governmental proceedings *per se*, there can be no serious contention that the public has no right to access to the meeting or that it has any less right than the press to videotape it.

The Defendants' suggestion in their motion to exceed the page limit for memoranda that the right to videotape is an open question in this Circuit is also not entirely correct. It has been held that allegations that restrictions on the recording of public meetings violate substantive due process rights are determined by whether they are reasonable in time place, and manner. The Financial Fire District Meeting is a limited public forum. *Rosenberg v. Rector and Visitors of Univ.* 515 U.S. 819, 829 (1995), at which the public generally has the same rights as it would in a public forum. The Second Circuit and Seventh Circuit have held that restrictions upon videotaping (or audiotaping) in a public forum be content neutral and reasonable. *Woods v. Township of West Whiteland*, 193 F. 3rd, 177 (3rd Cir. 1999), citing *United States v. Kerley*, 753 F.2d 617, 620-621 (7th Cir., 1985) and *United States v. Yonkers Board of Education*, 747 F.2d 111,114 (2d Cir. 1984). Although *Woods* held that there is no federal constitutional right to videotape a public meeting, the distinction made by the Defendants here between press recordings and those made by the public can not withstand legal scrutiny- they cannot pass the reasonableness test, especially in light of the prior well- known Supreme Court rulings cited above.

For the reasons stated above, the Court must find that the Defendants abridged the Plaintiffs' First Amendment rights to videotape the December 9, 2003 meeting.

II. Did the removal of Plaintiff Gorman, and threatened removal of Plaintiff Carlow violate their first amendment rights?

Like the previous question, the law is generally settled. *Woods v. Township of West Whiteland*, supra. discusses the public right of access to a local planning commission meeting, a body more or less analogous to the Fire District. The public's right of access turns upon a two part analysis– whether the place and process has historically been open to the press and general public, and whether public access plays a significant positive role in the functioning of the particular process in question. Id., at 183, citing *Press- Enterprise Co. v. Superior Court*, 478 U.S. 1, (1986). There is a six prong test in the Third Circuit used to decide the second prong of the test- 1) promotion of informed discussion of governmental affairs by providing the public with an understanding of the judicial system; 2) promotion of the public perception of fairness which can be achieved only by providing the public a full view of the proceedings; 3) providing a significant theraputic value as an outlet for community concern, hostility, and emotion, 4) serving as a check on corrupt practices by exposing the judicial process to public scrutiny; 5) enhancement of the performance of all involved; and 6) discouragement of perjury. Id.

The *Woods* court had no trouble finding a right of public access to the planning commission meeting. Nothing in the opinion suggests that the right of access is predicated on legal standing to participate in a vote at the meeting. The Plaintiffs here have an established track record as critics of the firefighting policy and spending habits of the Anthony Fire District. Whether the Defendants agree or not, it certainly is in the public interest for firefighters in the Anthony District to have access to and be heard at the financial meeting.

The claim of the Defendants that they were afraid that the Plaintiffs would move into the voters section and attempt to vote constituted disruption (Defendants' answer, ¶ 21), does not bear scrutiny. The meeting hall was not filled to capacity (Burns deposition, Page 5 Lines 12-24). The Plaintiffs were certainly known to Fire District officials, and Plaintiff Gorman was not removed from the voters section, but from the soda vending machine in the rear of the hall. (Id. Page 15 Lines 10-21 ). Plaintiff Carlow was threatened with removal because he got up to go to

the bathroom. Clearly, the real reason for the Defendant's actions was to intimidate the Plaintiffs from questioning firefighting practices or the incumbent management of the Anthony Fire District.

The First Circuit has considered the question of what constitutes disruption of a public forum (ironically in a case in which the Plaintiff was arrested for videotaping a public meeting., although the right to videotape was provided by the Massachusetts Open Meeting Law). Although the analysis of what constitutes "disruption" turns on Massachusetts law, it is clear that First Amendment concerns trump the statutory prohibitions. *Iocobucci v. Boulter*, no. 97-1485 (1st. Cir. 1999), copy appended hereto. Expressions protected by the First Amendment are not subject to disorderly conduct statutes. Id., page 7.

Judge Selya also analyzes what constitutes entitlement to qualified immunity. Although the opinion speaks to an actual arrest, as opposed to the removal of Gorman, the criteria are much the same: whether his removal was objectively legally reasonable. Id., page 8. Given the history between the parties, and the admitted facts surrounding Gorman's removal and Carlow's threatened removal, there can be no reasonable basis to provide the Defendants with any cloak of qualified immunity. These Defendants could not reasonably believe that Gorman or Carlow were "disruptive" in any objective way sufficient to justify removing them. The factual background suggests that the real reason for the removal and threatened removal was to squelch criticism of the Fire Department from its employees.

For the above- stated reasons, Summary Judgment should enter in favor of the Plaintiffs.

Respectfully submitted,

Gary D. Berkowitz, Esq.

# TABLE OF AUTHORITIES

## CASES

*Branzburg v. Hayes*, 408 U.S. 665, 684, 92 S.Ct 2646, 2658, 33 L. Ed. 2d 626 (1972)..............2

*Iocobucci v. Boulter*, no. 97-1485 (1st. Cir. 1999)..........................................................5

*Newman v. Graddick*, 696 F.2d 796, (11th Cir., 1983)....................................................3

*Nixon v. Warner Communications,* 435 U.S. 589 (1978).............................................2

*Press- Enterprise Co. v. Superior Court*, 478 U.S. 1, (1986).........................................4

*Rosenberg v. Rector and Visitors of Univ.* 515 U.S. 819, 829 (1995)..........................................3

*United States v. Kerley*, 753 F.2d 617, 620-621 (7th Cir., 1985) ..................................................3

*United States v. Yonkers Board of Education*, 747 F.2d 111,114 (2d Cir. 1984)........................3

*Woods v. Township of West Whiteland*, 193 F. 3rd, 177 (3rd Cir. 1999)......................................3, 4

## STATUTES

First Amendment..................................................................................... generally

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

ROBERT CARLOW, JAMES PERRY,    )
WILLIAM PERRY and DAVID GORMAN )
                               )
VS.                            )  Civil Action 04-325-S
                               )
STANLEY MRUK and CONRAD BURNS  )
in their personal and official )
capacities                     )

        Deposition of CONRAD BURNS taken on behalf of

the Plaintiffs on Friday, April 29, 2005, at the

offices of Gary D. Berkowitz, One James Street,

Providence, Rhode Island, commencing at 1:58 p.m.

before Dianne M. Dillon, Notary Public within and for

the State of Rhode Island and Providence Plantations.

APPEARANCES

BY:  GARY D. BERKOWITZ, ESQ. ...... FOR THE PLAINTIFFS

BY:  GEORGE H. RINALDI, ESQ. ...... FOR THE DEFENDANTS



| | | |
|---|---|---|
| 1 | Q | Do you remember where it was held? |
| 2 | A | Yes, Oddfellows Hall, Washington Street. |
| 3 | Q | I believe it's a club or a service? |
| 4 | A | It's a mason building. |
| 5 | Q | Do you know what the seating capacity of the building |
| 6 | | is? |
| 7 | A | Offhand, no. It's posted, and it's one of the things |
| 8 | | I have to watch for while I'm moderator. |
| 9 | Q | Do you recall whether the building has a capacity of |
| 10 | | more or less than one hundred people? |
| 11 | A | I don't. |
| 12 | Q | Do you recall how many people were at the meeting? |
| 13 | A | I don't have a count. If I had to say, roughly, |
| 14 | | sixty, seventy. |
| 15 | Q | Was the building full, or were there empty seats? |
| 16 | A | Empty seats. |
| 17 | Q | According to Mr. Mruk, the seating was divided into |
| 18 | | two sections; one for voters in the fire district, and |
| 19 | | the other for nonvoters, is that correct? |
| 20 | A | That is correct. |
| 21 | Q | Was the voters' section fully occupied? |
| 22 | A | No. |
| 23 | Q | Was the nonvoters' section fully occupied? |
| 24 | A | No. |
| 25 | Q | Were there any signs or markers indicating which was |

1    officer· to eject him.

2  Q  Was Mr. Gorman a voter or a nonvoter?

3  A  He was a nonvoter.

4  Q  I see.  Was he in the voters' section when he was

5     removed?

6  A  Yes.

7  Q  Where is the vending machine in relation to the

8     voters' and nonvoters' seating?

9  A  The extreme end of the hall.

10  Q  The voting and nonvoting sections were divided to the

11     left and right side of the hall, is that accurate; the

12     front and back?

13  A  The whole right side, from me facing to the front of

14     the hall, on my right was all voting.  On the left,

15     the back section was all nonvoting.

16  Q  And the vending machine was behind all of those seats

17     against the wall?

18  A  Yes, but he started off by walking into the voting

19     area.

20  Q  But he was at the vending machine when he was removed?

21  A  Yup.  I should say, yes, sir.

22  Q  I have no rank.  You don't have to call me sir.

23  A  I don't like "yup."

24  Q  Was anyone later removed from the meeting?

25  A  I don't remember.  I don't think so.  There may have

## No. 97-1485 (1st Cir. 10/04/1999) Iacobucci v. Boulter

Federal Appellate District: 1st

United States Court of Appeals For the First Circuit

Nos. 97-1485 & 97-1585

RICHARD IACOBUCCI, Plaintiff, Appellee,
v.
WILLARD BOULTER, Defendant, Appellant.

No. 97-1586

RICHARD IACOBUCCI, Plaintiff, Appellant,
v.
WILLARD BOULTER, Defendant, Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before Selya, Circuit Judge, Cyr, Senior Circuit Judge, and Lipez, Circuit Judge.

J. Russell Hodgdon, with whom Petze & Hodgdon was on brief, for plaintiff.
Stephen C. Pfaff, with whom Douglas I. Louison and Merrick, Louison & Costello were on brief, for defendant.

October 4, 1999

SELYA, Circuit Judge.

Earlier this year, the Supreme Court decided Kolstad v. American Dental Ass'n, 119 S. Ct. 2118 (1999), affording a fresh perspective on the circumstances under which juries may award punitive damages in federal civil rights cases. These cross-appeals require us to revisit the punitive damages threshold in light of Kolstad. After acquitting this responsibility and addressing other pertinent issues, we affirm the judgment below.

### I. BACKGROUND

On the evening of March 26, 1991, Richard Iacobucci, the plaintiff herein, visited the Pembroke Town Hall to videotape a scheduled meeting of the Pembroke Historic District Commission (the Commission). Such forays were mother's milk to Iacobucci, who intermittently filmed sessions of local boards, including the Commission, for a weekly news program that he produced and broadcast via a cable television outlet.

On the evening in question, the Commission's stated purpose was to review building applications. The commissioners sat along three sides of a four- sided conference table. As he had done in the past, Iacobucci positioned his tripod at the unoccupied end of the table. Soon after the meeting commenced, the chairman, Otis Hathon, twice asked Iacobucci to move his equipment across the room. Iacobucci

declined, explaining that his view of the commissioners' and applicants' faces would be obstructed. Hathon did not suffer rejection gladly; at one point, he extinguished the lights, remarking: I hope your camera can see in the dark. When this petulance failed to sway Iacobucci, Hathon warned him of the possibility of arrest should he fail to move. That warning, too, fell on deaf ears, prompting a commissioner to alert the local constabulary.

Two Pembroke police officers, Flannery and Jenness, responded. They asked Iacobucci to turn off the camera and talk with them in the corridor. Iacobucci replied that he had a right to record the proceedings, that he intended to exercise it, and that he would not converse until the meeting ended. The stalemated officers called their superior, Sergeant Willard Boulter (the principal defendant herein).

The meeting adjourned before Sgt. Boulter arrived, presumably because the last applicant had not appeared. Iacobucci packed his gear. He then noticed the commissioners speaking in the hallway with a man carrying a set of plans. Believing that man to be the tardy applicant, Iacobucci retrieved his camera and began filming the group on the assumption that he was witnessing a de facto resumption of the adjourned meeting. Iacobucci persisted despite importunings from some of the commissioners to stop.

Sgt. Boulter arrived at that juncture, stepped in front of the lens, and demanded that Iacobucci cease and desist. Iacobucci demurred, sidestepped adroitly, and resumed his journalistic endeavor. This pas de deux continued until Sgt. Boulter gave Iacobucci an ultimatum: sit down or be arrested. When Iacobucci kept filming, Boulter took the camera from him, grabbed his elbow, led him into another room, handcuffed him, and placed him under arrest.

The police transported Iacobucci to the station house and charged him with disorderly conduct and disrupting a public assembly. Iacobucci spent about four hours in custody before the authorities released him. When he reclaimed his camera, he discovered that the videotape no longer contained any images and that the sound track was barely audible.

The criminal charges eventually were dismissed, but Iacobucci (a law school graduate, although not a practicing attorney) filed a pro se civil action that asserted a golconda of claims against numerous defendants. We need not dwell on the details, because pretrial proceedings winnowed the trialworthy issues to three claims pressed by Iacobucci against Boulter. These included claims under 42 U.S.C. § 1983 premised on false arrest and excessive force, respectively, and a state-law claim premised on intentional infliction of emotional distress. The three claims were tried to a jury, which found for Boulter on two of them. On the section 1983 false arrest claim, however, the jury sided with Iacobucci and awarded him $75,000 in compensatory damages and $135,000 in punitive damages.

The verdict did not please Boulter. He renewed his earlier motion for judgment as a matter of law and asked, alternatively, for a new trial or for a remittitur. The district court struck the punitive damages, but otherwise denied Boulter's post-trial motions. Both parties now appeal.

II. BOULTER'S APPEAL

Like all Gaul, Boulter's appeal is divided into three parts. He assails the district court's handling of the section 1983 false arrest claim because the court (1) should not have permitted the claim, if ever properly in the case, to go to trial; (2) improvidently admitted evidence that was both irrelevant and prejudicial; and (3) erred in rejecting a qualified immunity defense. We examine these asseverations seriatim.

A. The Status of the Section 1983 False Arrest Claim.

The wrangling over this issue breaks down into two subsidiary questions: Was the section 1983 false arrest claim properly pled? If so, did it survive summary judgment? The district court answered both questions affirmatively. So do we.

In narrowing the issues immediately prior to trial, a dispute arose concerning what claims were outstanding. Boulter considered only two claims to be zoetic: a section 1983 excessive force claim and a state-law claim for intentional infliction of emotional distress. In contrast, Iacobucci took the position that a section 1983 false arrest claim also remained in the case. After reviewing the complaint and the summary judgment record, the lower court concluded that Iacobucci had adequately pled a section 1983 false arrest claim, and that this claim had not been addressed (let alone terminated) at the summary judgment stage. Consequently, the court allowed Iacobucci to litigate the claim.

Fed. R. Civ. P. 8(a)(2) requires that a complaint contain a short and plain statement of the claim showing that the pleader is entitled to relief. The complaint in this case satisfied that undemanding criterion vis-à-vis the section 1983 false arrest claim: it specifically alleged that Boulter, while acting under color of state law, violated Iacobucci's constitutional right to be secure in his person and wrongfully deprived him of his liberty. This language, coupled with a prayer for money damages, adequately stated a section 1983 false arrest claim.

To be sure, the claim could have been pled more clearly. Here, however, Boulter has not identified a scintilla of prejudice that may have resulted from any obscurity in the wording of the plaintiff's complaint, nor is any such prejudice readily apparent. The section 1983 false arrest claim arises out of the same nucleus of operative fact as the other two tried claims (both of which Boulter acknowledges were in the case all along), and the parties' discussions with the court immediately before the start of trial clarified any uncertainty about whether the section 1983 false arrest claim was to be litigated. The sockdolager is this: had prejudice loomed, Boulter could have asked the court for a continuance. His failure to do so leads ineluctably to the conclusion that any claim of unfairness that he now might assert is nothing more than a post hoc rationalization sparked by a verdict that was not to his liking. See Faigin v. Kelly, ___ F.3d ___, ___ (1st Cir. 1999) [No. 98-1589, slip op. at 34] (explaining that a reviewing court may attribute special significance to the party's eschewal of a continuance and assume that the party did not require additional time to adjust his litigation strategy).

We likewise reject Boulter's plaint that the section 1983 false arrest claim, even if pled, did not survive the district court's summary judgment order. In hawking this proposition, Boulter points to the concluding passage in the trial court's summary judgment ruling, in which Judge Saris stated: With respect to Sergeant Boulter, the motion is DENIED on the excessive force claim pursuant to 42 U.S.C. § 1983, and the intentional infliction of emotional distress claim. Otherwise it is ALLOWED. Boulter maintains that these final four words laid to rest any incipient section 1983 false arrest claim.

This argument is too cute by half. It overlooks that Boulter's motion, which set the stage for the court's summary judgment ruling, never sought brevis disposition as to the section 1983 false arrest claim. Thus, when Boulter made this very argument below, the district court rejected it, explaining that the otherwise language spoke only to the claims that had been debated in the summary judgment papers - and that the section 1983 false arrest claim was not among that number. A trial court ordinarily is the best expositor of its own orders, see United States v. Podolsky, 158 F.3d 12, 17 (1st Cir. 1998); Martha's Vineyard Scuba Headquarters, Inc. v. Unidentified, Wrecked and Abandoned Steam Vessel, 833 F.2d 1059, 1066-67 (1st Cir. 1987), and Boulter offers no convincing reason why we should ignore this salutary principle here. Because the district court reasonably interpreted its own order as not terminating the section 1983 false arrest claim, we honor its interpretation.

B. The Evidentiary Question.

Boulter next insists that the trial court erred in admitting the partially erased videotape into evidence. He bases this insistence on three grounds: lack of relevance, lack of a proper foundation, and undue prejudice. We review challenges to orders admitting or excluding evidence for abuse of discretion. See Faigin, ___ F.3d at ___ [slip op. at 24]; Williams v. Drake, 146 F.3d 44, 47 (1st Cir. 1998). We discern none here.

The facts are these. The videotape itself had been erased by parties unknown (although Iacobucci understandably suspected the police). At any rate, the audio portion of the tape picked up after the time that the police took Iacobucci into custody. It apparently recorded contemporaneous conversations amongst Boulter and his fellow officers. Boulter's objection runs to the admissibility of those comments.

Boulter's first line of attack emphasizes the temporal sequence. He argues that an after-the-fact recording necessarily lacks relevance. This ipse dixit is simply wrong. Evidence of subsequent events frequently sheds light upon, and thus assumes relevance in relation to, antecedent acts. See United States v. Lara, 181 F.3d 183, 204 (1st Cir. 1999); United States v. Sutton, 970 F.2d 1001, 1007 (1st Cir. 1992); United States v. Mena, 933 F.2d 19, 25 n.5 (1st Cir. 1991).

In this instance, the district court supportably determined that rational jurors might find that some of the statements made on the tape referred back to what had transpired at the time of the arrest. We recount a sampling in the margin. 1 Relevancy is a fluid concept under the Evidence Rules. See Fed. R. Evid. 401 (defining relevant evidence as having any tendency to make the existence of any material fact more probable or less probable than it would be without the evidence). Consequently, relevancy typically presents a rather low barrier to admissibility. See, e.g., Fitzgerald v. Expressway Sewerage Constr., Inc., 177 F.3d 71, 75 (1st Cir. 1999); United States v. Saccoccia, 58 F.3d 754, 780 (1st Cir. 1995). Taking into account that the excessive force, emotional distress, and false arrest claims were being tried together, we conclude that Judge Saris acted within the encincture of her discretion in deciding that the challenged statements cleared this hurdle.

Boulter's second line of attack centers on his contention that the audio portion of the tape ought to have been excluded because Iacobucci's enhancement of it somehow destroyed the tape's integrity. This contention amounts to a claim that the evidence lacked a proper foundation. Such claims are committed to the trial judge's informed discretion. See United States v. Ladd, 885 F.2d 954, 956 (1st Cir. 1989); see also Fed. R. Evid. 901(a), 1001(2) & 1002.

Boulter's contention trenches on the frivolous. Iacobucci testified to the chain of custody. He also testified that he did not alter the tape in any way, but, rather, enhanced the sound by the simple expedient of listening to it on a high-quality play-back system that increased its audibility. The judge (and the jury, for that matter) were free to credit this testimony, especially since Boulter offered no evidence to contradict it. No more was exigible.

Boulter's final line of attack postulates that the failure to identify the voices on the tape prior to its admission into evidence created unfair prejudice. See Fed. R. Evid. 403. 2 This argument, too, strikes us as insubstantial.

As noted above, the tape itself was properly authenticated prior to its admission. Thereafter, several witnesses (mainly police officers) testified as to the identities of the speakers. Moreover, the officers whose voices were alleged to have been captured on the tape (Boulter among them) testified at trial; the jury thus had the opportunity to determine for itself who spoke which lines.

Against this backdrop, we see no Rule 403 problem. The rule does not aspire to eliminate prejudice -

after all, most evidence is offered precisely because the proponent believes it will prejudice the factfinder in his favor - but only to eliminate unfair prejudice. See, e.g., Veranda Beach Club Ltd. Partnership v. Western Sur. Co., 936 F.2d 1364, 1372 (1st Cir. 1991); United States v. Rodriguez-Estrada, 877 F.2d 153, 156 (1st Cir. 1989). Given the sound track's potentially significant probative value (especially in regard to Boulter's state of mind as it pertained to the section 1983 excessive force claim) and the absence of any unfairly prejudicial impact, we cannot fault the district court's overruling of Boulter's Rule 403 objection. See Freeman v. Package Mach. Co., 865 F.2d 1331, 1340 (1st Cir. 1988) (Only rarely - and in extraordinarily compelling circumstances - will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect.).

C. Qualified Immunity.

42 U.S.C. § 1983 provides a private right of action against officials who, while acting under color of state law, deprive individuals of federally assured rights. But this kind of rights-violating conduct does not translate automatically into money damages, for a state actor may enjoy an immunity (absolute or qualified). In this instance, Boulter says that the lower court erred in failing to exonerate him based on the doctrine of qualified immunity.

Qualified immunity is a medium through which the law strives to balance its desire to compensate those whose rights are infringed by state actors with an equally compelling desire to shield public servants from undue interference with the performance of their duties and from threats of liability which, though unfounded, may nevertheless be unbearably disruptive. Buenrostro v. Collazo, 973 F.2d 39, 42 (1st Cir. 1992) (citing Harlow v. Fitzgerald, 457 U.S. 800, 806 (1982)). Hence, state officials exercising discretionary authority are entitled to qualified immunity insofar as their conduct does not transgress clearly established constitutional or federal statutory rights of which a reasonably prudent official should have been aware. Id. To ascertain a defendant's eligibility for such immunity, a court must inquire into the objective legal reasonableness of the defendant's actions, gauged in connection with the mosaic of legal rules that were clearly established when the defendant acted. See Anderson v. Creighton, 483 U.S. 635, 639 (1987). In operation, the outcome of this inquiry depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified. Id.

Iacobucci asserts that Boulter, a policeman acting under color of his official authority, lacked probable cause to arrest him and thereby violated his Fourth Amendment rights. In this wise, he observes that a citizen's right to be free from arrest in the absence of probable cause has long been clearly established. See, e.g., Beck v. Ohio, 379 U.S. 89, 91 (1964). That observation sweeps so broadly, however, that it bears very little relationship to the objective legal reasonableness vel non of Boulter's harm-inducing conduct. See Wilson v. Layne, 119 S. Ct. 1692, 1699-1700 (1999). The right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense. Anderson, 483 U.S. at 640. Our inquiry, then, reduces to whether a reasonable police officer, standing in Boulter's shoes, would have known that arresting Iacobucci for disorderly conduct, under all the attendant circumstances, would contravene clearly established law. That inquiry must proceed in light of the commonly held understanding that probable cause exists only if the facts and circumstances within the arresting officer's knowledge are sufficient to lead an ordinarily prudent officer to conclude that an offense has been, is being, or is about to be committed, and that the putative arrestee is involved in the crime's commission. Logue v. Dore, 103 F.3d 1040, 1044 (1st Cir. 1997).

Before wrestling with this question, we pause to voice some procedural concerns. Boulter first raised the issue of qualified immunity in a pretrial motion for summary judgment. Although he tries in this forum to assign error to the denial of that motion, a pair of procedural impediments frustrates the attempt. For one thing, an order denying summary judgment typically does not merge into the final

judgment and therefore is not an independently appealable event if the case thereafter proceeds to trial. See Eastern Mountain Platform Tennis, Inc. v. Sherwin-Williams Co., 40 F.3d 492, 497 (1st Cir. 1994).

For another thing, in his notice of appeal, Boulter purported to challenge only the amended judgment entered by the district court on March 31, 1997 - a decree sparked by the court's denial of his motion for judgment as a matter of law. It is black-letter law that a notice of appeal must specify the order or judgment to which the appeal is addressed. Lehman v. Revolution Portfolio LLC, 166 F.3d 389, 395 (1st Cir. 1999) (citing Fed. R. App. P. 3(c)). Boulter's failure to specify the order denying summary judgment in his notice of appeal thus bars his current attempt to contest the propriety of that ruling. See id.

In all events, the district court supportably concluded that Boulter's summary judgment motion did not seek to test the bona fides of the section 1983 false arrest claim. See supra Part II(A). Since the scope of the protection afforded by the doctrine of qualified immunity is claim- specific, see, e.g., Feliciano-Angulo v. Rivera-Cruz, 858 F.2d 40, 48 (1st Cir. 1988); Vazquez Rios v. Hernandez Colon, 819 F.2d 319, 326-28 (1st Cir. 1987), this omission means that Boulter could not have raised a qualified immunity defense as to that claim at the summary judgment stage. And Boulter's assertion in the motion papers of a qualified immunity defense in regard to Iacobucci's section 1983 excessive force claim cannot fill this void.

Notwithstanding these infirmities, the qualified immunity issue is not a dead letter. Although qualified immunity normally should be resolved early in the litigation, see Mitchell v. Forsyth, 472 U.S. 511, 526 (1985), the defense, if preserved, may be pressed at later stages, including in a timeous post-trial motion. See, e.g., Consolo v. George, 58 F.3d 791, 794 (1st Cir. 1995). Because Boulter filed such a motion and now assigns error to its denial, the issue must be addressed. 3

In the ordinary course, we review the district court's denial of qualified immunity de novo, aligning the evidence most favorably to the non-movant and drawing all reasonable inferences in his favor. See, e.g., Camilo- Robles v. Hoyos, 151 F.3d 1, 8 (1st Cir. 1998); Amsden v. Moran, 904 F.2d 748, 752-53 (1st Cir. 1990). But this familiar formulation of the standard arises in connection with pretrial orders granting or denying qualified immunity, and Iacobucci maintains that the intervening trial and verdict pretermit (or, at least, reconfigure) the inquiry. He points out that when Boulter made the arrest, he charged Iacobucci with having committed two offenses: disorderly conduct and disturbing a public assembly. Iacobucci notes correctly that this charging decision circumscribes the inquiry into probable cause. Building on this foundation, he posits that we need not look beyond the verdict, in which the jury, answering a special interrogatory, found that no reasonable police officer would have believed that Iacobucci had committed either offense. Boulter resists this approach: he asserts that the jury's merits determination neither extinguishes nor bears upon his claim of entitlement to qualified immunity.

Not surprisingly, there is a middle ground. A state actor may be entitled to qualified immunity for rights-violating conduct as long as he had an objectively reasonable basis for believing that his conduct would not abridge the rights of others. See Camilo-Robles v. Zapata, 175 F.3d 41, 43 (1st Cir. 1999); Quintero de Quintero v. Aponte-Roque, 974 F.2d 226, 228 (1st Cir. 1992). This means, of course, that the reasonableness standards underlying the probable cause and qualified immunity inquiries are not coterminous. See Anderson, 483 U.S. at 641. Thus, the jury's determination does not squarely answer the question whether Boulter's conduct in arresting Iacobucci satisfied the criterion of objective legal reasonableness so as to entitle him to qualified immunity.

Nor does the procedural posture in which Boulter's appeal arises greatly influence the standard of review. When a qualified immunity defense is pressed after a jury verdict, the evidence must be construed in the light most hospitable to the party that prevailed at trial. See Thompson v. Mahre, 110

.3d 716, 721 (9th Cir. 1997); Karnes v. Skrutski, 62 F.3d 485, 494 (3d Cir. 1995); Posr v. Doherty, 944 F.2d 91, 95-96 (2d Cir. 1991). One difference is that, in such an exercise, deference should be accorded to the jury's discernible resolution of disputed factual issues. See Frazell v. Flanigan, 102 F.3d 877, 886 (7th Cir. 1996).

With this paradigm in mind, we turn to the facts. The first of the two charges on which Boulter arrested Iacobucci - disorderly conduct - implicated Mass. Gen. Laws c. 272, § 53. 4 In pertinent part, the statute makes it a misdemeanor to be a disorderly person. To stave off constitutional attacks, the Massachusetts Supreme Judicial Court (SJC) originally construed section 53 to provide that one is guilty under that rubric

... if, with purpose to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he: (a) engages in fighting or threatening, or in violent or tumultuous behavior; or (b) makes unreasonable noise or offensively coarse utterance, gesture or display, or addresses abusive language to any person present; or (c) creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor.

Alegata v. Commonwealth, 231 N.E.2d 201, 211 (Mass. 1967) (quoting Proposed Official Draft of Model Penal Code § 250.2).

In the next decade, the SJC narrowed this definition of disorderly conduct to encompass only activities not implicating the lawful exercise of a First Amendment right. Commonwealth v. A Juvenile, 334 N.E.2d 617, 628 (Mass. 1975). To ensure that result, the SJC modified its earlier definition by striking subsection (b) entirely and interpreting subsections (a) and (c) to cover only conduct, not expressive activity. See id. at 629. Consistent with this approach, the SJC subsequently held that a verbal challenge, even when coupled with a refusal to obey a police officer's orders, does not constitute disorderly conduct within the meaning of section 53 as long as done in furtherance of a legitimate purpose. See Commonwealth v. Feigenbaum, 536 N.E.2d 325, 328 (Mass. 1989). To this extent, then, the contours of the disorderly conduct statute were clearly visible when Boulter confronted Iacobucci at the Pembroke Town Hall.

Context is important in police work, as elsewhere in human intercourse. Thus, upon being apprised of the ongoing events at the Town Hall, Boulter recognized that the circumstances required a reasonable police officer to take into account the Massachusetts Open Meeting Law, Mass. Gen. Laws c. 39, § 23B, and he took steps to refresh his recollection of that enactment. The statute requires that [a]ll meetings of a governmental body... be open to the public, and confers a right to videotape such meetings on any person in attendance. The right to videotape is not unfettered: the camera must be fixed in one or more designated locations determined by the governmental body, and the taping may not actively interfere with the conduct of the meeting. Id. Withal, the statute does not apply to any chance meeting, or a social meeting at which matters relating to official business are discussed so long as no final agreement is reached. Id.

Given this background, we are constrained to conclude that, taking the evidence in the light most flattering to Iacobucci, his constitutional right to act as he did without being arrested for disorderly conduct was sufficiently clear that a reasonable official would [have understood] that what he [was] doing violate[d] that right. Anderson, 483 U.S. at 640 ; accord Wagenmann v. Adams, 829 F.2d 196, 209 (1st Cir. 1987).

Taking first the events that transpired in the meeting room, we note that Iacobucci had satisfied the basic prerequisites for entitlement to videotape a public meeting under the Open Meeting Law: he had

situated his tripod in the only stationary location that would allow the mounted camera to capture the faces of both the commissioners and the applicants and there is no significantly probative evidence that his activities interfered with the ongoing meeting. 5 Indeed, his equipment had been placed in the very same location during prior Commission meetings, without incident. Moreover, after Hathon tired of trying to bully Iacobucci, the instant meeting proceeded without disruption and the Commission completed its business unimpeded by the filming. Iacobucci remained cool, calm, and collected throughout. Under the circumstances and in light of the clearly established law that obtained at the time of the incident, we agree with Judge Saris that an objectively reasonable officer would not have thought that Iacobucci was subject to arrest for disorderly conduct.

Taking next the hallway episode, we find nothing whatever to suggest that Iacobucci was fighting or threatening, or was engaged in any violent or tumultuous behavior. A Juvenile, 334 N.E.2d at 628; see also Sheehy v. Plymouth, ___ F.3d ___, ___ (1st Cir. 1999) [No. 98-2080, slip op. at 16]. On any version of the events reflected in the record, no objectively reasonable police officer would have believed that Iacobucci had created a hazardous or physically offensive condition... which serve[d] no legitimate purpose. A Juvenile, 334 N.E.2d at 628. Even if the gathering was not a public meeting at that point, Iacobucci was doing nothing wrong: he was in a public area of a public building; he had a right to be there; he filmed the group from a comfortable remove; and he neither spoke to nor molested them in any way. 6

Boulter's repeated demands that Iacobucci cease recording do not change the disorderly conduct calculus. A police officer is not a law unto himself; he cannot give an order that has no colorable legal basis and then arrest a person who defies it. So it is here: because Iacobucci's activities were peaceful, not performed in derogation of any law, and done in the exercise of his First Amendment rights, Boulter lacked the authority to stop them.

The other ground of arrest fares no better under close scrutiny. That ground implicated Mass. Gen. Laws c. 272, § 40, which makes it a misdemeanor to willfully interrupt[] or disturb[] a school or other assembly. As to the events that transpired in the meeting room, the record, read as it must be in the light most favorable to Iacobucci, contains no evidence that he interrupted or disturbed the Commission's meeting. See supra note 5 and accompanying text. As to the events that transpired in the hallway, Boulter was adamant in his insistence that the hallway gathering was not a public meeting.

There is no point in flogging a dead horse. We conclude that the district court did not err in holding that Boulter's arrest of Iacobucci failed to attain the level of objective legal reasonableness. Hence, Boulter was not entitled to qualified immunity.

## III. IACOBUCCI'S APPEAL

Although voicing doubts about whether a satisfactory foundation for punitive damages had been laid, the district court prudently reserved judgment on that question and sent it to the jury. After the jurors awarded Iacobucci $75,000 in compensatory damages and $135,000 in punitive damages, Boulter moved for relief. Concluding that the evidence failed to warrant punitive damages, the district court struck that portion of the award (albeit leaving intact the compensatory damages). Iacobucci contests this ruling. We review the lower court's decision de novo, taking the facts and the reasonable inferences therefrom in the light most congenial to the jury's verdict. See Correa v. Hospital San Francisco, 69 F.3d 1184, 1188 (1st Cir. 1995).

The district court's approach accurately foretold that taken by the Supreme Court a few months later in Kolstad v. American Dental Ass'n, 119 S. Ct. 2118 (1999). 7 Punitive damages become a

discretionary matter for the jury in a section 1983 action only if the plaintiff makes an adequate threshold showing. A plaintiff reaches that threshold when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others. Smith v. Wade, 461 U.S. 30, 56 (1983).

Kolstad sheds considerable light on Smith and the circumstances under which a judge may permit a jury to consider a request for punitive damages in a civil rights case. The Smith standard, visualized through the Kolstad lens, confirms that there is a different focus for compensatory as opposed to punitive damages. See Kolstad, 119 S. Ct. at 2124. The special showing needed to trigger eligibility for punitive damages, which the Smith Court called evil motive or reckless or callous indifference, Smith, 461 U.S. at 56, pertains to the defendant's knowledge that [he] may be acting in violation of federal law, not [his] awareness that [he] is engaging in discrimination, Kolstad, 119 S. Ct. at 2124. Thus, the standard requires proof that the defendant acted in the face of a perceived risk that [his] actions [would] violate federal law. Id. at 2125. While egregious or outrageous acts may serve as evidence supporting an inference of the requisite 'evil motive,' the presence (or absence) of such acts does not in itself determine the propriety (or lack of propriety) of punitive damages in a given case. Id. at 2126.

To make out a jury question on punitive damages under this subjectively oriented test, Iacobucci needed to adduce evidence sufficient to prove that Boulter arrested him in the face of a perceived risk that doing so would violate Iacobucci's federally assured rights. More specifically, Iacobucci needed to adduce evidence sufficient to show that Boulter determined to effectuate the arrest knowing that he lacked probable cause to do so, or, at least, with conscious indifference to the possibility that he lacked probable cause. 8

We realize that the district court instructed the jury to determine whether Boulter had acted intentionally or recklessly in arresting Iacobucci, and that the jury, by returning a plaintiff's verdict on the section 1983 false arrest claim, necessarily found that Boulter's conduct fit into that proscribed category. This mens rea finding, however, does not clear the way for punitive damages. The state of mind required to make out a cognizable section 1983 claim (at least one grounded in false arrest) differs importantly from that required to justify punitive damages. See Kolstad, 119 S. Ct. at 2124. The former requirement relates only to the conduct, not to the consequence; that is, it entails an intent to do the act, not to effect a civil rights violation. See id.

On this issue, the district court concluded that although Boulter made an objectively unreasonable split-second decision when he arrested Iacobucci, no evidence suggested that he harbored any malice or acted with reckless indifference to Iacobucci's constitutional rights. After carefully scrutinizing the record, we agree with this assessment. Viewed most favorably to Iacobucci, the evidence reveals that when apprised of the contretemps, Boulter called a selectman to get a better sense of the Open Meeting Law. Upon his arrival, he attempted to piece together a complete picture of the evening's events. He then made several attempts to defuse a contentious situation. Only after his attempted intercessions were rebuffed did he effect an arrest. This constellation of facts does not lend itself to the inference that Boulter acted with an evil motive or a conscious awareness that the arrest might violate Iacobucci's civil rights. Where, as here, the evidence shows no more than that an exasperated police officer, acting in the heat of the moment, made an objectively unreasonable mistake, punitive damages will not lie.

Laboring to close this gap, Iacobucci suggests that the partially erased videotape contains evidence indicative of a state of mind conducive to punitive damages. He points to a statement contained therein from which (he says) the jury could have inferred that the videotape had been erased to provide cover against a potential excessive force claim. The jury, however, found for Boulter on the section 1983 excessive force count - and the videotape contains nothing that bears on Boulter's motives in connection with the arrest. We conclude, therefore, that this evidence fails to lift the punitive damages issue into the

realm of the jury's discretion.

To summarize, the district court acted appropriately in defenestrating the punitive damages award. The dearth of record evidence, direct or circumstantial, as to Boulter's evil motive and/or subjective awareness that he lacked probable cause to arrest Iacobucci suffices to defeat the claim for punitive damages as a matter of law.

We add a coda. Precedent in this circuit had interpreted Smith to mean that in civil rights cases requiring proof of intentional wrongdoing, the state of mind necessary to trigger liability for the wrong is at least as culpable as that required to make punitive damages applicable. Rowlett v. Anheuser-Busch, Inc., 832 F.2d 194, 205 (1st Cir. 1987). Kolstad plainly rejects that interpretation. To the extent that Rowlett fails to draw a distinction between the state of mind requirement anent the actor's conduct and the state of mind requirement anent the effects of that conduct, it is no longer good law, and we disavow it.

## IV. CONCLUSION

We need go no further. For the reasons set forth above, we reject all three appeals and leave the parties where we found them.

Affirmed. Each party to bear his own costs.

---

Footnotes

The sound track contained, inter alia, statements by various police officers, Boulter included, to the following effect:

- Just what are you accusing me of doing here?

- Ooh, erasing evidence?

- Evidence of what?

- Of police brutality.

- If you call grabbing his f.....g elbow police brutality.

The rule provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed. R. Evid. 403.

To be sure, Iacobucci argues that Boulter waived the defense at this stage of the litigation. We need not probe the point too deeply. The district court addressed qualified immunity head-on in its post-trial rescript and we assume, for argument's sake, that no waiver transpired.

The statute provides in pertinent part:

Common night walkers, common street walkers, both male and female, common railers and brawlers, persons who with offensive and disorderly acts or language accost or annoy persons of the opposite sex, lewd, wanton and lascivious persons in speech or behavior, idle and disorderly persons, disturbers of the peace, keepers of noisy and disorderly houses, and persons guilty of indecent exposure may be punished [as provided by law].

Mass. Gen. Laws c. 272, § 53.

Although the chairman did order Iacobucci to move the camera at some point after the meeting began, he did not designate an alternative location, and, in any event, the record evinces no reasonable basis for requiring relocation to a position that would nullify effective recording of the proceedings.

It is no defense for Boulter to say that he believed the group was engaged in private conversation. Filming such a conversation on public property in pursuit of an indisputably legitimate purpose clearly was not disorderly conduct within the statutory definition. See Feigenbaum, 536 N.E.2d at 328; cf. Swerdlick v. Koch, 721 A.2d 849, 858 (R.I. 1998).

The Kolstad Court examined the punitive damages provision found in 42 U.S.C. § 1981a(b)(1). At the outset of its analysis, the Court noted that when Congress drafted that provision, it modeled the language on that employed in Smith v. Wade, 461 U.S. 30 (1983) (a seminal case on punitive damages under 42 U.S.C. § 1983). The Court therefore interpreted the relevant statutory terms in lockstep with its understanding of the parallel language in Smith. See Kolstad, 119 S. Ct. at 2124-25. Consequently, we believe that Kolstad's teachings are fully applicable to punitive damages under section 1983.

Our qualified immunity determination, see supra Part II(C), does not directly address this requirement. In assaying qualified immunity, we inquired into whether Boulter's presumed belief that probable cause existed was objectively reasonable. The focus of the punitive damages inquiry, however, is subjective.

© Lawriter Corporation. All rights reserved.

The Casemaker™ Online database is a compilation exclusively owned by Lawriter Corporation. The database is provided for use under the terms, notices and conditions as expressly stated under the online end user license agreement to which all users assent in order to access the database.