**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

**ROBERT CARLOW, JAMES PERRY**
**WILLIAM PERRY and DAVID GORMAN**

**v.** **C.A.No.: 04-325-S**

**STANLEY MRUK and**
**CONRAD BURNS, in their personal and**
**official capacities**

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Now come the defendants, Stanley Mruk and Conrad Burns, and, pursuant to Rule 56 of the Federal Rules of Civil Procedure, move this Honorable Court for Summary Judgment in their favor and against the plaintiffs, Robert Carlow, James Perry, William Perry and David Gorman. In support thereof, the defendants state that there are no genuine issues of material fact in dispute and that they are entitled to judgment as a matter of law as they are immune from suit pursuant to the legislative and/or qualified immunity doctrines since enforcing rules of order during the annual meeting of the Coventry Fire District barring non-residents from addressing the meeting and video taping the meeting did not violate the First Amendment rights of the plaintiffs; and, in the case of defendant Mruk, played no role the events upon which the Complaint is based. The defendants further rely on the memorandum of law, and the exhibits appended thereto, filed contemporaneously herewith and incorporated herein as if set forth in full.

WHEREFORE, the defendants, Stanley Mruk and Conrad Burns, respectfully request that this Honorable Court grant their motion for summary judgment in their favor and against the plaintiffs, Robert Carlow, James Perry, William Perry and David Gorman.

Respectfully submitted,

Defendants, STANLEY MRUK AND
CONRAD BURNS

By their attorneys,

George H. Rinaldi (# 5599)
Little Medeiros Kinder Bulman & Whitney
72 Pine Street
Providence, RI 02903
Tel: (401)272-8080
Fax: (401)272-8195

Dated: July 29, 2005

**CERTIFICATION**

I hereby certify that on the 29th day of July, 2005, I caused a true and accurate copy of the within Motion to be mailed, by first class mail, postage prepaid, to Gary D. Berkowitz, Esq., 1 James Street, Providence, RI 02903

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

**ROBERT CARLOW, JAMES PERRY**
**WILLIAM PERRY and DAVID GORMAN**

**v.** **C.A. No.: 04-325-S**

**STANLEY MRUK and**
**CONRAD BURNS, in their personal and**
**official capacities**

# DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

## FACTS AND TRAVEL

The Coventry Fire District ("District") was established by the Rhode Island Legislature in 1889 to provide fire protection services to a portion of Coventry, Rhode Island commonly known as Anthony.[1] P.L. 1889 ch. 806. ("Authorizing Act"). The Authorizing Act provides for an annual district meeting on the second Tuesday of December, P.L. 1889 ch. 806, § 3, as well as for the election of the District's moderator. P.L. 1889 ch. 806, § 4. The Authorizing Act also provides for the election of a Chief of the District. P.L. 1925 (House Bill 738, page 427) § 15. The defendant, Stanley Mruk, is the Chief of the District, and the defendant, Conrad Burns, is the District's moderator. During the District's annual meetings, the District's residents approve the District's operating budget and tax rates for the upcoming year as well as consider various resolutions governing the operation of the District and the Anthony Fire Department.[2]

---

[1] There are seven independent fire districts which provide fire and rescue services to the Town of Coventry.

[2] While the formal name of the District is the Coventry Fire District, its fire department is commonly referred to as the Anthony Fire Department.

Chief Mruk and other District officers also give reports on the state of the District and respond to questions from the residents. (Exhibit 1 - Deposition of Chief Mruk ("Mruk") at 8-9)

The annual district meeting for 2003 was held on December 9, 2003 with Mr. Burns serving as moderator. As moderator, Mr. Burns presides over the annual meetings, R.I.Gen. Laws § 45-3-17, and "has the power to manage and regulate the business of each meeting, conforming to law, and to maintain peace and good order at the meeting." R.I.Gen. Laws § 45-3-18.[3] Chief Mruk has no role in the conduct of the District's annual meetings, but does report on the state of the District and answer questions for voters that are within his purview. (Exhibit 1 - Mruk at 9 and 24) As with

[3] Title 45, Chapter 3 of the Rhode Island General Laws establishes the procedures for town meetings, including financial town meetings. See Pine v. McGreavy, 687 A.2d 1244 (R.I. 1997). Sections 45-3-17 through 45-3-20 describe the powers and duties of the moderator. The term "town" is not defined. Section 45-3-17 states, however, that "[i]n **all** meetings of the electors or **voters in a town, representative district, or voting district,** the moderator of the meeting shall preside." R.I.Gen.Laws § 45-3-20. (emphasis added). Since the Coventry Fire District is a quasi municipal corporation, Cole v. East Greenwich Fire-Engine Company, 12 R.I. 202 (1878), comprised of a portion of the town of Coventry, meetings of its voters come within the scope of these sections. Although the Rhode Island Supreme Court has not addressed this issue, the annual meetings of fire districts are clearly a "meeting of ... voters in a town." Had the legislature intended the exclude fire districts from the scope of these statutes, it would have used the phrase "voters **of a town,**" rather than "voters **in a town.**" Moreover, the issues confronted by the voters of the Coventry Fire District are the same as those confronted by the voters of the town of Coventry at its financial town meeting. The District's voters approve the budget and set the tax rates for the coming year and vote on specific issue as they arise. P.L. 1889 ch. 806 §§ 4, 5, 6 and 9. Since the legislature has not enacted laws which specifically govern the conduct of meetings of fire districts, applying these general meeting statutes is entirely appropriate.

Nor would this be the first time that a statute addressed to a city or town were held to apply to fire districts. In Rhode Island State Labor Relations Board v. Valley Falls Fire District, 505 A.2d 1170, 1170 (R.I. 1986) the Rhode Island Supreme Court held that firefighters employed by fire districts had the right to collectively bargain with their employers even though the Firefighter Arbitration Act ("FFA") specifically limited that right to the firefighters of "any city or town." Id. at 1171 *citing* R.I.Gen. Laws § 28-9.1-2(b). In so doing, the Court rejected the fire district's argument that because "a fire district is neither a city or town, nor is it included in the definitions or city or town[,]" the FFA was not applicable to it. Id. The Court did so despite an earlier case which held that fire districts did not come within the meaning of a city or town for purposes of the Public Utilities Act. East Providence Water Company v. Public Utilities Commission, 46 R.I. 458, 128 A.2d 556 (1925) Like the reference in § 45-3-17 to "all meetings of ... voters **in a** town ...", the FAA defines a firefighter as, *inter alia*, "all employees ... of any paid fire department **in any city or town** within the state." R.I.Gen. Laws § 28-9.1-3(2). Again, the legislature used the phrase "in any city or town" rather than "of any city or town." As a result, firefighters employed by fire districts come within the scope of this definition.

all of the District's annual meetings, the 2003 Annual Meeting was open to the public, but, in accordance with § 45-3-26 of the Rhode Island General Laws, non-voters were instructed to sit separate and apart from the voters.

While voters are allowed to speak during the District's annual meetings, non-voters are not allowed to speak during the meetings.[4] (Exhibit 2 – Deposition of Conrad Burns ("Burns") at 11) This rule flows from § 45-3-20 of the Rhode Island General Laws which requires the moderator to take a vote on pending issues "after having heard **all of the electors** entitled to vote on the motion who desire to be heard[,]"R.I.Gen. Laws § 45-3-20, (Emphasis added), as well as the Authorizing Act itself which speaks in terms of the authority of the District's residents to vote on specific motions at the annual meetings. P.L. 1889 ch. 806. None of the plaintiffs is a resident of, or a voter in, the Coventry Fire District .[5] Several residents who spoke at the meeting were critical of Chief Mruk, Mr. Burns and/or the general operation and/or policies of the District and its fire department. (Exhibit 3 -- Burns Affidavit, ¶ 5; Exhibit 4 – Portions of Minutes of 2003 Annual Meeting "Meeting Minutes")

At the start of the 2003 Annual Meeting, Mr. Burns announced the rules of order which would govern the meeting. In addition to standard rules, which, *inter alia*, prohibit non-residents from addressing the meeting, (Exhibit 3 - Burns Affidavit, ¶ 3), Mr. Burns announced a rule prohibiting the videotaping of the meeting. (Exhibit 2 - Burns at 8) The rationale for this rule was two-fold: First, prior to the start of meeting

[4] Voters who wish to speak at the meeting must come to the microphone at the front of the hall and give their name and address. (Exhibit 2 - Burns at 11)

[5] It is clear from the Complaint that neither James Perry, William Perry nor David Gorman is a resident of the Coventry Fire District. (Complaint ¶ 2, 3, and 4). While Robert Carlow is resident of Coventry, (Complaint ¶ 1), he is not a resident of the Coventry Fire District because he does not reside within the boundaries of the District. (Exhibit 3 - Burns Affidavit, ¶ 4)

attendees shined the lights from their video cameras in Mr. Burns' eyes; second, the use of video cameras intimidates the voters. (Exhibit 2 - Burns at 8 and10) After the rules of the meeting were announced, a voter made a motion to rescind this rule. The motion was then put to a vote, where it was defeated by four votes. There was no motion that the vote be retaken using paper ballots (the vote was originally taken by a voice vote and then by a show of hands) or that the motion be reconsidered and a revote taken. (Exhibit 2 - Burns at 17; Exhibit 3 -- Minutes of Meeting [6]).

On or about July 29, 2004, Robert Carlow, James Perry, William Perry and David Gorman filed the instant action against Mr. Burns and Chief Mruk pursuant to 42 U.S.C. § 1983 ("§1983") alleging that the defendants Conrad Burns and Chief Mruk violated their rights under the First Amendment of the Constitution of the United States. ("First Amendment"). All of the plaintiffs are alleging that they had a First Amendment right to speak at the District's 2003 Annual Meeting even though they are not residents of the District. Plaintiffs Carlow, James Perry and William Perry are also alleging that they had a First Amendment Right to videotape the meeting even though the voters refused to allow it.

The defendants Conrad Burns and Chief Stanley Mruk now move for summary judgment and the entry of final judgment on these allegations pursuant to the absolute and qualified immunity doctrines because (1) there is no First Amendment right for non-residents to speak at, or videotape, the meetings of public meetings, and (2) the decisions made by Mr. Burns regarding the enforcement of the rules of order governing the 2003 annual meeting were made in a legislative capacity. Chief Mruk also moves to

---

[6] These minutes were adopted by the voters at the start of the 2004 annual meeting and are the official minutes of the 2003 annual meeting. (Exhibit 3 - Burns Affidavit, ¶ 7). R.I.Gen. Laws § 42-46-7.

dismiss the allegations against him because, by law, he plays no role in the conduct of the District's annual meetings.

## ISSUES

1. Can an individual who, under Rhode Island Law, has no role in the conduct of the District's annual meetings, be held liable for decisions made during those meetings by the moderator?

2. Do non-residents have the right under the First Amendment of the United States Constitution to address the District's annual meetings, at which the residents vote, *inter alia*, to approve the budget and set the tax rate for the coming year, despite a rule of procedure to the contrary?

3. Do non-residents have the right under the First Amendment of the United States Constitution to videotape the District's annual meeting, even if the moderator determines that such action would be distracting and intimidating and the voters uphold his decision?

4. If any of the preceding issues is answered in the affirmative, is this action barred by the absolute immunity granted to individuals acting in a legislative capacity when they enforce rules of order?

5. If issues 1-3 are answered in the affirmative, but 4 in the negative, is this action barred by the qualified immunity doctrine given that the issues involve complex areas of Constitutional law and several United States Courts of Appeal have found that there are no such rights under the First Amendment?

## ARGUMENT

I. The Allegations Against Chief Mruk Must Be Dismissed Because, Under Rhode Island Law, Chief Mruk Has No Role In The Conduct Of The District's Annual Meetings.

Although Chief Mruk plays no role in the conduct of the District's annual meetings, including the one at issue, (Exhibit 2 - Burns at 4; Exhibit 1 - Mruk at 5), the plaintiffs have named him as a defendant in this matter. As a matter of law, Mr. Burns, as the moderator, presides over the meetings, R.I.Gen.Laws § 45-3-17, "maintain[s] peace and good order at the meeting[s,]" R.I.Gen. Laws § 45-3-18 and orders the

removal of disorderly attendees. R.I.Gen. Laws § 45-3-19. Under Rhode Island law, neither Chief Mruk, nor any other person, plays any role whatsoever in the conduct of the meeting. Moreover, both Chief Mruk and Mr. Burns testified that they did not even speak about the conduct of the 2003 Annual Meeting. (Exhibit 2 - Burns at 4; Exhibit 1 - Mruk at 5). It is the moderator who runs the meeting and it was Mr. Burns who, in his capacity as moderator, was called upon to enact the rules and make the decisions which are the subject of this complaint. As Chief Mruk testified, he was completely unaware of these developments because he was sitting at a table at the front of the hall preparing to give his report. (Exhibit 1 - Mruk at 11 and 24) To the extent that the complaint alleges that Chief Mruk is liable for those decisions, it should, therefore, be dismissed.

II. The Allegations Against Mr. Burns Must Be Dismissed Pursuant To The Absolute Immunity Doctrine.

In accordance with its Authorizing Legislation, the District conducts an annual meeting every December. Such meetings have been called "the most democratic assemblage of any body that conducts the financial affairs of a municipality." Pine v. McGreavy, 687 A.2d 1244, 1245 (R.I. 1997). During this meeting, the residents of the District adopt a budget and tax rate for the upcoming year, receive reports on the past year, and vote on a number of resolutions concerning the operation of the District and its fire department. (Exhibit 1 - Mruk at 8) The annual meetings are governed by Title 45, Chapter 3 of the Rhode Island General Laws. Mr. Burns, as the District's moderator, presides over these meetings. R.I.Gen. Laws § 45-3-17. He "has the power to manage and regulate the business of each meeting, conforming to law, and to maintain peace and good order at the meeting." R.I.Gen. Laws § 45-3-18. To ensure peace and good order,

"any person [who] conducts himself or herself in a disorderly manner … may [be] order[ed] … to withdraw from the meeting [by the moderator] and on the person's refusal, … [be taken] from the meeting and … confin[ed] … in some convenient place until the meeting is adjourned. Person[s] refusing to withdraw shall, for each offense, be fined not exceeding twenty dollars ($20.00)." R.I.Gen. Laws § 45-3-19.

The plaintiffs seek to impose personal liability on both Mr. Burns and Chief Mruk because Mr. Burns enforced the rules governing the conduct of the District's annual meeting. Indeed, they are asking this court to order them to personally pay monetary damages because, *inter alia*, Mr. Burns honored the will of the voters when they voted to uphold the ban on the videotaping of the meeting. Since Mr. Burns did nothing more than carry out the will of the voters and ensure that they could carry out their task of voting on the District's business in an orderly and efficient fashion, these claims must be dismissed pursuant to the legislative immunity doctrine.[7]

"Officials acting in a legislative capacity have absolute immunity from suit and liability under § 1983. The function of such immunity is to insure that the legislative function may be performed independently without fear of outside interference. Legislative immunity applies to local legislators as well as to their state and federal counterparts[.]" Acevedo-Garcia v. Vera-Monroig, 204 F.3d 1, 7-8 (1st Cir. 2000) (Internal citations and quotations omitted). Although not an issue here, "[a]n official's bad motivation, or unworthy purpose does not affect the immunity privilege so long as the actions fall within the ambit of protected legislative activity." Id. As the First Circuit

[7] As discussed above, the claims against Chief Mruk should be dismissed because he does not play a role in the conduct of the District meeting. In the alternative, the claims against Chief Mruk should be dismissed for the reasons discussed here and in the following sections. Henceforth, all references to Mr. Burns refer to Mr. Burns and Chief Mruk collectively.

has held, "the doctrine of legislative immunity must protect legislators and legislative aides who do no more than carry out the will of the body by enforcing the rule as a part of their official duties." National Association of Social Workers v. Harwood, 69 F.3d 622, 632 (1st Cir. 1995)

In Harwood, several special interest groups sued John Harwood, then the Speaker of the Rhode Island House of Representatives ("House"), under § 1983 after he enforced a House rule banning lobbyists from the House floor while the House was in session. The First Circuit dismissed the case pursuant to the absolute immunity doctrine. In so doing, the Court held that

> **it is beyond serious dispute that enforcing a duly enacted legislative rule ... is well within the legislative sphere**. Such a restriction necessarily affects the manner in which the House conducts its most characteristic legislative functions, *e.g.* debating and voting. A rule that colors the very conditions under which legislators engage in formal debate is indubitably part and parcel of the legislative process, and the acts of House officials (whether or not elected members) in enforcing it are therefore fully protected against judicial interference by the doctrine of legislative immunity. 69 F.3d at 632 (Emphasis Added); see also Collinson v. Gott, 895 F.2d 994, 1008 (4th Cir. 1990) (Wilkinson, J., concurring) (Presiding officer of board of county commissioners was engaged in a legislative function when he ruled a resident out of order at a public meeting.)

This is exactly what Mr. Burns was doing when he made the decisions which ultimately led to the filing of the instant complaint.

In carrying out his duties as moderator and enforcing the rules of order, Mr. Burns did nothing more than ensure that the will of the voters prevailed and that they were able to carry out the business of the District. Non-residents of the District are not allowed to speak at the District's annual meetings and there are claims against Mr. Burns that are based on his enforcement of that rule. By vote taken at the meeting, the voters

decided that the Meeting could not be videotaped and there are claims against Mr. Burns that are based on his enforcement of that vote. Fulfilling his statutory duty to ensure that all of the voters are heard and able to conduct their business in an orderly efficient manner in accordance with the duly adopted rules of order is as much a legislative function as enforcing a rule banning lobbyists from the House floor. Moreover, "[c]onducting a public meeting to [discuss the operation of the District] fits comfortably within the definition of the legislative function originally referenced by Justice Frankfurter in Tenney[ v. Brandhove, 341 U.S. 367, 371, 71 S.Ct. 783, 785 (1951).]" Id. at 1008. (Wilkinson, J., concurring). Ensuring that public meetings function smoothly and in accordance with the rules is "an integral part of the legislative process. The flow of information through that process could be severely jeopardized if every public meeting carried with it the threat of civil liability, not to mention punitive damages." Id. (Wilkinson, J., concurring).

Only by granting moderators such as Mr. Burns absolute immunity when called on to enforce the rules of order so that the voters can exercise their rights, can moderators do their jobs without the potential distraction and inhibitions brought on by the fear of lawsuits and damage awards. Id. at 1009 (Wilkinson, J., concurring) *citing* Harlow v. Fitzgerald, 457 U.S. 800, 816, 102 S.Ct. 2727, 2737 (1982). As Judge Wilkinson observed, "[s]ection 1983 was not intended to make actionable isolated incidents in politicians show poor judgment at a public meeting in calling someone out of order. [Absent the application of the absolute immunity doctrine,] every disgruntled speaker [will be able] to force his opponents into federal court [and ] require local officials to second guess themselves every time they raise the gavel." Id. at 1005-1006.

(Wilkinson, J., concurring). The complaint should, therefore, be dismissed pursuant to the absolute legislative immunity doctrine. Collinson, 895 F.2d at 1005 – 1011 (Wilkinson, J., concurring);[8] National Association of Social Workers, *supra*

III. The Allegations Against Mr. Burns Must Be Dismissed Pursuant To The Qualified Immunity Doctrine.

A. General Standards Of The Qualified Immunity Doctrine

To the extent that this complaint is not dismissed pursuant to the absolute immunity doctrine, it should be dismissed pursuant to the qualified immunity doctrine. "Qualified immunity protects public officials from section 1983 civil liability so long as they acted reasonably under settled law in the circumstances." Veilleux v. Perschau, 101 F.3d 1, 2 (1st Cir. 1996) *quoting* Hunter v. Bryant, 502 U.S. 224, 228, 112 S.Ct. 534, 537 (1991) "Qualified immunity is intended to shield public officials 'from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.'" Fabiano v. Hopkins, 352 F.3d 447, 452-453 (1st Cir. 2003), *quoting* Anderson v. Creighton,483 U.S. 635, 638, 107 S.Ct. 3034 (1987)

The question of "[w]hether a defendant actually infracted a plaintiff's rights is not the central issue: Even defendants who violate constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standard. The 'applicable standard' is an objective one." Amsden v. Moran, 904 F.2d 748, 751 (1st Cir.

[8] Two of the three judges in Collinson held that the presiding officer was entitled to summary judgment "by reason of official immunity to suit." 895 F.2d at 995. In a concurring opinion, one judge did so pursuant to the qualified immunity doctrine, 895 F.2d at 995 – 1005 (Phillips, J. concurring), whereas the second did so pursuant to the absolute immunity doctrine. 895 F.2d at 1005 – 1011 (Wilkinson, J., concurring).

1990) The key inquiry focuses on the "objective legal reasonableness" of the defendant's actions. Anderson v. Creighton,483 U.S. 635, 639, 107 S.Ct. 3034, 3039 (1987). The critical question when applying the qualified immunity doctrine is, therefore, "[c]ould an objectively reasonable official, situated similarly to the defendant, have believed that his conduct did not violate the plaintiff's constitutional rights, in light of clearly established law and the information possessed by the defendant at the time of the alleged wrongful conduct?" Wood v. Clemons, 89 F.3d 922, 927 (1st Cir. 1996) This question "is for the judge to make, and not the jury." Hall v. Ochs, 817 F.2d 920, 924 (1st Cir. 1987)

The plaintiffs are seeking damages pursuant to 42 U.S.C. § 1983 under two separate theories: (1) that their First Amendment rights where violated when they were not allowed to speak at the Annual Meeting, and (2) that their First Amendment rights were violated when they were not allowed to videotape the Annual Meeting. Because the plaintiffs, as non-residents, had no First Amendment right to speak at the meeting, and because there is no First Amendment right to videotape public meetings, both of these claims must fail.

B. Right to Speak

1. There Is No Clearly Established Constitutional Right For Non-Residents To Speak At The Meetings Of Public Bodies.

The complaint alleges that the plaintiffs were denied their First Amendment right to speak at the Meeting. It is axiomatic, however, that to be denied a right to speak, such a right must actually exist. Because the plaintiffs are not residents of the District, they have no such right. Only residents are allowed to speak at the District's

annual meetings. (Exhibit 3 - Burns Affidavit, ¶ 3) This rule follows directly from § 45-3-20 of the Rhode Island General laws which requires the moderator to take a vote on pending issues "after having heard **all the electors entitled to vote** on the motion who desire to be heard[,]" R.I.Gen. Laws § 45-3-20, (emphasis added) as well as the District's Authorizing Act which speaks in terms of the powers to the Districts residents' to vote on the District's affairs. While the plaintiffs imply that they were barred from speaking because they would have been critical of the Chief Mruk, Mr. Burns and the District's operations and administration, several residents of the District, who addressed the meeting were critical of Chief Mruk and the way that the District was being run. (Exhibit 3 - Burns Affidavit, ¶ 5). The resident-only rule was applied to everyone who wished to speak. Indeed, a member of the Town Council of the Town of Coventry who wished to speak at the 2003 Annual Meeting could not do so because he was not a resident of the District. (Exhibit 3 – Burns Affidavit, ¶ 6). Thus, only if the District's residency rule is found to be unconstitutional are the First Amendment rights of the plaintiffs violated.

"The Constitution does not grant to members of the public generally a right to be heard by public bodies making decisions of policy." Minnesota State Board For Community Colleges v. Knight, 465 U.S. 271, 283, 104 S.Ct. 1058, 1065 (1984). "Policymaking organs in our system of government have never operated under a constitutional constraint requiring them to afford every interested member of the public an opportunity to present testimony before any policy is adopted." Id., at 284, 104 S.Ct. at 1066. Thus, neither the plaintiffs nor any other individual has a First Amendment right to speak at meetings of the Coventry Fire District, or the meetings of any other public

body. The First Amendment is only implicated because the District allows residents to speak during its annual meetings. Therefore, in order to establish that they had a right to speak at the annual meeting, the plaintiffs must prove that the residents only rule violates the First Amendment. This they cannot do.

The First Circuit has not had the opportunity to consider if rules restricting the right of public comment to residents violate the First Amendment rights of non residents. "It is axiomatic[, however,] that not every limitation of freedom of expression insults the First Amendment. A curtailment of speech violates the Free Speech Clause only if the restricted expression is, in fact, constitutionally protected and if the government's justification for the restriction is inadequate." Berner v. Delanhanty, 129 F.3d 20, 25 (1st Cir. 1997) (citations omitted). While the First Circuit has yet to consider this issue, the Court of Appeal for the Eleventh Circuit has held that limiting the rights of non-residents to speak at city council meetings passes constitutional muster. Rowe v. City of Cocoa, Florida, 358 F.3d 800 (11th Cir. 2004). The United States Supreme Court has also held that "a speaker may be excluded from a nonpublic forum if he wishes to address a topic not encompassed within the purpose of the forum." Cornelius v. NAACP Legal Defense & Education Fund, 473 U.S. 788, 806, 105 S.Ct. 3439, 3451 (1985) Similarly, the Ninth Circuit Court of Appeals has held that **"public bodies must have a rather broad authority to structure meetings, even if that requires limiting subject matter and number and types of speakers."** Kindt v. Santa Monica Rent Control Board, 67 F.3d 266, 270 (9th Cir. 1995) (Emphasis added). The Ninth Circuit has also held that a city council "does not violate the first amendment when it restricts public

speakers to the issue at hand[.]" White v. City of Norwalk, 900 F.2d 1421, 1425 (9th Cir. 1990)

These permissible restrictions flow from the very nature of meetings of public bodies. As the Ninth Circuit has observed, "[p]ublic forum or not, the usual first amendment antipathy to content-oriented control of speech cannot be imported into [City] Council chambers intact. In the first place, in dealing with agenda items, the Council does not violate the first amendment when it restricts public speakers to the issue at hand. While a speaker may not be stopped from speaking because the moderator disagrees with the viewpoint he is expressing, it certainly may stop him if his speech becomes irrelevant or repetitious." White, 900 F.2d at 1425. The right of public bodies to specify which individuals may speak at their meetings, and on what topics they may speak, is consistent with First Amendment principles.

The first step in evaluating the plaintiffs' claim that their First Amendment rights to speak at the Annual Meeting is to "identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic." Cornelius, 473 U.S. at 797, 105 S.Ct. at 3446. The United States Supreme Court has "identified three types of fora: the traditional public forum, the public forum created by government designation, and the nonpublic forum." Id. at 802, 104 S.Ct. at 3449 *citing* Perry Education Association v. Perry Local Educators' Association, 460 U.S. 37, 45, 103 S.Ct. 948, 945 (1983). The High Court has also referred to a limited public forum. Good News Club v. Milford Central School District, 533 U.S. 98, 106, 121 S.Ct. 2093 (2001). This reference has created some confusion amongst the lower courts. The First Circuit is no exception. Compare Berner v.

Delahanty, 129 F.3d 20, 26 (1st Cir. 1997) (Using "limited public forum" as synonym for "designated public forum."), with Fund for Community Progress v. Kane, 943 F.2d 137, 138 (1st Cir. 1991) (Using "limited public forum" as synonym for "nonpublic forum.") In November of 2004, however, the First Circuit ended the confusion and adopted the "usage equating limited public forum with non-public forum[.]" Ridley v. Massachusetts Bay Transportation Authority, 390 F.3d 65, 76 n. 4 (1st Cir. 2004). The question therefore is whether the District created a limited public forum or a designated public forum when it allowed residents of the District to speak at its annual meetings.

Under long established procedures, non-residents are not allowed to speak at the District's annual meetings. Voters, however, are not only allowed to speak, they have a statutory right to do so. R.I.Gen. Laws § 45-3-20. By refusing to allow non-residents to address its annual meetings, the District has created a quintessential limited public forum. Hotel Employees & Restaurant Employees Union, Local 100 of New York v. City of New York Department of Parks & Recreation, 311 F.3d 534, 545 (2nd Cir. 2002) (A limited public forum is created when the "government makes its property generally available to a certain class of speakers as opposed to reserving eligibility to select individuals who must first obtain permission to gain access.") Put another way, in a limited public forum the government authorizes expressive activity "but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects." Id. Meetings of public bodies, which "may confine their meetings to a specified subject matter[,]" City of Madison Joint School District v. Wisconsin Employment Relations Commission, 429 U.S. 167, 175 n.8, 97 S.C.t. 421, 426 n.8 (1976), are clearly within the scope of a limited public forum even though the public is invited to observe at least

portions of the proceedings. See Make the Road By Walking, Inc. v. Turner, 378 F.3d 133, 144 (2nd Cir. 2004) ("[A] forum ... does not abrogate its nonpublic status if the visitors are not permitted to express themselves freely in that forum.").

That meetings of public bodies are properly classified as limited public fora and, in accordance with the First Circuit's announcement in Ridley, synonymous with nonpublic fora, is also apparent from the nature of such meetings. The meetings of public bodies are "not the equivalent of a municipal theater ... or a public park or street. One would certainly not expect the forum of a Township meeting to include such expressive activities as performance art, lectures on medieval history or arguments about private disputes involving town citizens." Eichenlaub v. Township of Indiana, 385 F.3d 274, 281 (3rd Cir. 2004). Public bodies, should they decide to allow public comment, may limit such comment to agenda items without running afoul of the First Amendment. Cornelius, 473 U.S. at 806, 105 S.Ct. at 3451. Such content-based discrimination is a hallmark of a nonpublic forum. Id., at 806, 105 S.Ct. at 3451. As the Ninth Circuit has observed, "[w]ith all of those restrictions, the type of forum described looks very much like a nonpublic one. *** It seems to us that the highly structured nature of city council and city board meetings makes them fit more neatly into the nonpublic forum niche." Kindt, 67 F.3d at 270

Having classified the District's Annual Meeting as a limited public forum, the next issue is "whether the justifications for the exclusion from the relevant forum satisfy the requisite standard." Cornelius, 473 U.S. at 797, 104 S.Ct. at 3446. Since the Ridley Court recently held that a limited public forum is synonymous with a nonpublic forum, Ridley, 390 F.3d at 76 n. 4, the residency restriction must be upheld if it is

"reasonable in light of the purpose served by the forum and [is] viewpoint neutral." Cornelius, 473 U.S. at 806, 104 S.Ct. at 3451; Fund for Community Progress, Inc. v. Kane, 943 F.2d 137, 138 (1st Cir. 1991) ("If properly characterized as limited public, exclusions are permitted so long as reasonable.")

The Annual Meeting is concerned solely with the operation of the Coventry Fire District, and a major part of the meeting is the approval of the District's annual budget and tax rate. (Exhibit 1 - Mruk at 5) The residents of the District are directly impacted by the votes taken at these meetings and as such the District has a legal and moral obligation to ensure that their voices are heard. Moreover, "[t]here is a significant governmental interest in conducting orderly efficient meetings of public bodies." Rowe, 358 F.3d at 803. As the United States Supreme Court has held, "[t]he necessities of confining a forum to the limited and legitimate purposes for which it was created may justify the State in reserving it for certain groups or for the discussion of certain topics." Rosenberger v. Rector and Visitors of the University of Virginia, 515 U.S. 819, 829, 115 S.Ct. 2510, 2516-2517 (1995). Restrictions on public debate "may be said to have served a significant governmental interest in conserving time and in ensuring that others had an opportunity to speak." Wright v. Anthony, 733 F.2d 575, 577 (8th Cir. 1984) (Upholding time limit on speakers during public comment portion of meeting). As the Rowe Court observed, prohibiting non-residents from speaking at meetings of public bodies allows the public body "to both hear members of the community and to move its meetings along." Rowe, 358 F.3d at 803. The District's residency rule "simply [does] not impermissibly restrict speech[,]" Rowe, 358 F.3d at 803, and is, therefore, constitutionally permissible.

This is not to say that there are no restrictions on the District. "The [District] may not exclude speech where its distinction is not reasonable in light of the purpose served by the forum, nor may it discriminate against speech on the basis of its viewpoint. Rosenberger, 515 U.S. at 829, 115 S.Ct. at 2516-2517 (internal citations and quotations omitted). "Thus, in determining whether the State is acting to preserve the limits of the forum it has created so that the exclusion of a class of speech is legitimate, we have observed a distinction between on the one hand, content discrimination, which may be permissible if it preserves the purposes of that limited forum, and, on the other hand, viewpoint discrimination, which is presumed impermissible when directed against speech otherwise within the forum's limitations." Rosenberger, 515 U.S. at 829-830, 115 S.Ct. at 2517. "The bedrock principle of viewpoint neutrality demands that the state not suppress speech where the real rational for the restriction is disagreement with the underlying ideology or perspective that the speech expresses. A distinction is viewpoint based if it denies access to a speaker solely to suppress the point of view he espouses. The essence of viewpoint discrimination is not that the government incidentally prevents certain viewpoints from being heard in the course of suppressing certain general topics of speech, rather, it is a governmental intent to intervene in a way that prefers one particular viewpoint in speech over other perspectives on the same topic." Ridley v. Massachusetts Bay Transportation Authority, 390 F.3d 65, 82 (1st Cir. 2004) (internal quotations and citations omitted).

The District's "residency restriction is viewpoint-neutral. A residency requirement does not restrict speech based on a speaker's viewpoint but only on the basis of residency. *** [T]he [District] ... uniformly excludes all nonresidents from speaking

…" at its annual meetings. Rowe, 2003 WL 22102150 at 9. A nonresident who wished to praise Chief Mruk to heavens would be barred from speaking at the District's annual meetings. Conversely, residents are routinely allowed to voice their displeasure with Chief Mruk. Indeed, several of them did just that at the Annual Meeting during which the Plaintiffs claim that they were prohibited from speaking because they would have been critical of Chief Mruk. (Exhibit 3 – Burns Affidavit, ¶ 5; Exhibit 4 – Minutes of Meeting) The District's behavior at its Annual Meeting concerning the First Amendment rights of various individuals is a hornbook example of permissible content discrimination versus impermissible viewpoint.[9]

The resident only speaking rule serves a valid and rational purpose and is applied in a neutral manner. As such, the First Amendment rights of the plaintiffs were not violated at the Annual Meeting because, as non residents, they simply had no right to speak at that meeting. As such, the allegations in the Complaint that the plaintiffs were denied the right to speak in violation of their First Amendment rights should be dismissed.[10]

---

[9] Even if the District's residency restriction were to be examined under designated public forum, or even a traditional public forum paradigm, the restriction passes constitutional muster. Content neutral restrictions on speech are constitutionally permissible in designated and public fora if the restriction is "narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels of communication." Perry Education Association v. Perry Local Educators' Association, 460 U.S. 37, 45, 103 S.Ct. 948, 955 (1983). It is well established that "[t]here is a significant governmental interest in conducting orderly, efficient meetings of public bodies." Rowe, 358 F.3d at 802-803; Collinson, 895 F.2d at 1000 (Phillips, J., concurring) (The "disruption of the orderly conduct of public meeting is indeed one of the substantive evils that government has a right to prevent.") (Internal modification and quotation omitted)

[10] For the reasons set forth in this section, the plaintiffs' request for a declaration that they had and continue to have a First Amendment right to speak at the District's annual meetings should be denied.

2. Enforcing The Resident Only Rule, Was Objectively Reasonable Under The Circumstances.

While it is clear that the plaintiffs did not have a First Amendment right to speak at the Annual Meeting, the defendants would still be entitled to qualified immunity even if that were not the case. For purposes of the qualified immunity doctrine, the critical question is whether a reasonable person standing in the shoes of Mr. Burns "would have understood that [his or] her conduct violated clearly established law." Fabiano, 352 F.3d at 453. "The purpose of this requirement is to ensure that before they are subjected to suit, officers are on notice that their conduct is unlawful." Fabiano, 352 F.3d at 457. "In this context, the phrase 'clearly established' has a special definition: 'The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Amsden, 904 F.2d at 752 *quoting* Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct 3034 (1987). As the above discussion illustrates, it is certainly not the case that a reasonable moderator would have known that enforcing a resident only rule with respect to the right to address an annual meeting of a fire district violated the First Amendment. If anything, the law clearly establishes that such a restriction is perfectly permissible.

The Free Speech Clause of the First Amendment is deceptively simple: the government cannot limit what its citizens have to say. As with most constitutional issues, however, the devil is in the detail. There is considerable debate amongst the federal courts as to the standards to be applied when reviewing the limits that public bodies may place on the rights of its citizens to speak at public meetings. Even the United States Supreme Court has struggled with this question. The confusion is

compounded here because none of the plaintiffs are citizens of the District. The nature of the meeting must also be considered.

The District was established to fight and prevent fires in a small area of Coventry, Rhode Island. It has but one regularly scheduled meeting per year, where the residents of the District approve the annual budget and tax rate and vote on resolutions governing the operation of the District and its fire department. (Exhibit 1 - Mruk at 5). Under Rhode Island law, moderators of such meetings have the right to seat non-voters in a separate area of the meeting, R.I.Gen.Laws § 45-3-26, and have "the power to manage and regulate the business of each meeting, conforming to law, and to maintain peace and good order at the meeting." R.I.Gen.Laws § 45-3-18. Moreover, § 45-3-20 speaks only of the right of **voters** to address the meeting before a vote is taken on a particular issue. R.I.Gen.Laws § 45-3-20. Restricting the right to speak to voters follows directly from these statutes. See Rowe, *supra.* It is certainly reasonable for a moderator to believe that laws which require votes to be taken "after having heard **all electors entitled to vote** on the motion who desire to be heard," R.I.Gen. Laws § 45-3-20, (emphasis added) and allow for the segregation of non-voters from voters, R.I.Gen. Laws § 45-3-26, give him the power to enforce a residents only speaking rule. Indeed, these laws compel such a rule. Given these circumstances, any reasonable moderator would have enforced the District's resident only speaking rule and, therefore, Mr. Burns is entitled to qualified immunity even if such a rule violates the First Amendment.

C. Right to Videotape

1. There Is No Clearly Established Constitutional Right To Videotape The Meetings Of Public Bodies.

At the start of the Annual Meeting, Mr. Burns announced that videotaping was not permitted. The rule was enacted because, prior to the meeting, at least one attendee flashed the lights of his video recorder in Mr. Burn's eyes and because Mr. Burns felt that allowing videotaping would intimate the voters. (Exhibit 2 - Burns at 10) A voter objected to this rule and moved that a vote be taken to reverse this rule and allow the meeting to be videotaped. Mr. Burns allowed the vote to be taken and the motion to allow videotaping failed. (Exhibit 2 - Burns at 17; Exhibit 4 - Minutes at 1) Not willing to accept the will of the voters of the District, the plaintiffs filed suit claiming that they had a First Amendment right to videotape the meeting. In addition to seeking a declaration that they have a constitutional right to videotape future annual meetings, the plaintiffs are also seeking monetary damages under § 1983. The plaintiffs are, therefore, seeking to hold Mr. Burns and Chief Mruk financially responsible for the decision of the District's voters to bar the videotaping of the Annual Meeting.

Under the qualified immunity doctrine, the initial question is whether there is a clearly established First Amendment right to videotape meetings of the Coventry Fire District. As this court observed in Belcher v. Mansi, 569 F.Supp. 379, 379 (D.R.I. 1983), this is an "enigmatic question," and the Belcher Court chose "not [to] resolve these arcane questions[.]" Id. at 382. [11] While this issue appears to be a matter of

[11] In Belcher v. Mansi, 569 F.Supp. 379 (D.R.I. 1983), this Court held that the Rhode Island Open Meetings Act gives individuals the right to audio tape public meetings. The District's Annual Meeting is not, however, subject to the Rhode Island Open Meetings Act. Pine v. McGreavy, 687 A.2d 1244 (R.I. 1997)

first impression in the First Circuit, several courts have held that there is no First Amendment Right to videotape meetings of public bodies. Whiteland Woods, L.P. v. Township of West Whiteland, 193 F.3d 177, 184 (3rd Cir. 1999) (No "federal constitutional right to videotape meetings [of local planning commission]"); Csorny v. Shoreham-Wading River Central School District, 759 N.Y.S.2d 513, 519 (N.Y.App.2d 2003) ("We agree that the First Amendment to the United States Constitution does not guarantee the right to videotape governmental meetings."); Johnson v. Adams, 629 F.Supp. 1563 (E.D.Texas 1986) ("First Amendment … [does not] mandate that the videotaping of the regular session of the [County] Commissioners Court … be allowed."); see also Wright v. City of Lawrence, 486 N.E.2d 1151, 1154 (Mass.App.Ct. 1985) (Question of allowing videotaping of city council meetings is best left to council and not the courts.) Recently, the Eighth Circuit has also held that "neither the public nor the media has a First Amendment right to videotape, photograph or make audio recordings of governmental proceedings that are by law open to the public[.]" Rice v. Kempker, 374 F.3d 675, 678 (8th Cir. 2004) (No First Amendment right to videotape executions) In so doing, the Eight Circuit noted that "**courts have universally found that restrictions on videotaping and cameras do not implicate the First Amendment guarantee of public access.**" Id. at 679 (citing cases) (emphasis added). These holdings are consistent with First Amendment principles.

While any right to videotape a public meeting would be grounded in the First Amendment, the traditional "forum analysis is [not] necessary to resolve such restrictions on the right of access. Traditionally, the speech forum doctrine applies to expressive or speech activity. *** [Here], the alleged constitutional violation consisted

of a restriction on [the plaintiffs'] right to receive and record information." Whiteland Woods, 193 F.3d at 182-183. Therefore, "[t]he critical question ... is whether the restriction [on videotaping] meaningfully interferes with the public's ability to inform itself of the proceeding: that is, whether it limits the underlying right of access rather than regulating the manner in which that access occurs." Id. at 183. Put another way, in order for the ban on videotaping to be a violation of the plaintiffs' First Amendment rights, there must be a nexus between their right of access and their alleged right to videotape the Annual Meeting. Id., at 183-184.

The ban on videotaping did not prevent the plaintiffs from attending the annual meeting. Nor did the ban prevent the plaintiffs from taking notes on what was done at the meeting or prevent the plaintiffs from obtaining the official minutes of the meeting. Simply put, the "plaintiffs [have] failed to demonstrate an essential nexus between the right of access and the right to videotape the [District's Annual Meeting]. Accordingly, ... [the plaintiffs have] failed to demonstrate any deprivation of [their] First Amendment rights." Whiteland Woods, 193 F.3d at 183-184. The fact that the plaintiffs had a statutory right to attend the Annual Meeting does "not create a federal constitutional right to videotape the meetings." Id. at 184. As such, the allegations in the Complaint that the decision of Mr. Burns to enforce the voters decision to ban the videotaping of the meeting violated the First Amendment rights of the plaintiffs must be dismissed.[12]

---

[12] For the reasons set forth in this section, the plaintiff's requested for a declaration that they had and continue to have a First Amendment right to videotape the District's annual meetings should be denied.

2. Enforcing The No Videotape Rule Was Objectively Reasonable Under The Circumstances.

As the preceding discussion indicates, the existence of a constitutional right to videotape public meetings is, in the words of the Belcher Court an "enigmatic" and "arcane" question. Belcher, 569 F.Supp at 382. Surely, if a federal judge finds the issue "enigmatic" a reasonable person in the shoes of Mr. Burns would not know that such a constitutional right existed. This is particularly true given that several Circuit Courts of Appeal have, as discussed above, found that there is no Constitutional right to videotape public meetings.

Assuming *arguendo* that such a right exists, however, the Belcher decision makes Mr. Burn's decision to uphold the will of the voters even more understandable. In Belcher, this Court held that the Rhode Island Open Meetings Act gives individuals the right to audio tape public meetings. The District's Annual Meeting is not, however, subject to the Rhode Island Open Meetings Act. Pine v. McGreavy, 687 A.2d 1244 (R.I. 1997) Given that the Belcher decision conditioned the right to record public meetings on the Open Meetings Act, it is certainly reasonable for a moderator to conclude that a meeting which is not subject to that act is not subject to its command that the public has the right to record its meetings. Thus, even if there were a clear constitutional right to videotape the meeting, Mr. Burns is entitled to qualified immunity because, given Belcher and McGreavey, a reasonable moderator would have also upheld the voters' decision to prohibit the videotaping of the meeting. As such, Mr. Burns is entitled to qualified immunity even if there were a constitutional right to videotape public meetings.

**Conclusion**

The allegations against Chief Mruk and Mr. Burns arise out of decisions that Mr. Burns made, in accordance with his statutory obligation, to ensure the District's annual meeting ran smoothly and efficiently. As such, Mr. Burns and Chief Mruk are entitled to absolute immunity from the allegations of the complaint pursuant to the legislative immunity doctrine. Even if this were not the case, however, it is far from clear that the plaintiffs, as non-residents, had a First Amendment Right to speak at the annual meeting of the Coventry Fire District. Indeed, it is clear that no such right exists. Similarly, the First Amendment does not guarantee the right of anyone to videotape public meetings. Both Chief Mruk and Mr. Burns are therefore also entitled to the protection of the qualified immunity doctrine.

WHEREFORE, the defendants, Stanley Mruk and Conrad Burns, respectfully request that this Honorable Court grant their motion for Summary Judgment and enter Final Judgment in their favor and against the plaintiffs, Robert Carlow, James Perry, William Perry, and David Gorman.

Respectfully submitted,

Defendants, STANLEY MRUK AND
CONRAD BURNS

By their attorneys,

George H. Rinaldi, (#5599)
Little Medeiros Kinder Bulman & Whitney
72 Pine Street
Providence, RI 02903
Tel: (401)272-8080
Fax: (401)272-8195

Dated: July 29, 2005

**CERTIFICATION**

I hereby certify that on the 29th day of July, 2005, I caused a true and accurate copy of the within Motion to be mailed, by first class mail, postage prepaid, to Gary D. Berkowitz, Esq., 1 James Street, Providence, RI 02903