**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

**ROBERT CARLOW**
**JAMES PERRY**
**WILLIAM PERRY and**
**DAVID GORMAN**

**v.** **Civil Action 04-325-S**

**STANLEY MRUK and**
**CONRAD BURNS in their personal**
**and official capacities**

**DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS**

Now come the Defendants, Stanley Mruk and Conrad Burns, and, pursuant to Rule 12.1(a)(2), hereby respond to the Statement of Undisputed Facts submitted by the Plaintiffs in support of their Motion for Summary Judgment.

1. As to Plaintiff Robert Carlow:
   a. That he is a firefighter in the Anthony Fire Department;
   b. That he is a resident of Coventry.

Response of Defendants:

a. Undisputed.
b. Undisputed.

2. As to Plaintiff James Perry:
   a. That he is a firefighter in the Anthony Fire Department;
   b. That he is a resident of Warwick.

Response of Defendants:

a. Undisputed.
b. Undisputed.

3. As to Plaintiff James Perry:

a. That he is a volunteer firefighter in the Anthony Fire Department.

Response of Defendants:

a. Undisputed to the extend it alleges James Perry was a volunteer prior to becoming a paid firefighter in the Anthony Fire Department.

4. Stanley Mruk is the Fire Chief of the Coventry Fire District.

Response of Defendants:

Undisputed.

5. Conrad Burns is the District Auditor of the Coventry Fire District.

Response of Defendants:

Undisputed.

6. The Coventry Fire District held its annual financial meeting ("the meeting") at the Manchester Hall within the Town of Coventry, on December 9, 2003. Said meeting is open to the public, and its purpose is to elect public officers and budget the spending of public tax funds. Individuals who are not taxable inhabitants of the District are subject to space limitations and other restrictions permitted to attend the meeting.

Response of Defendants:

Undisputed.

7. At the meeting, it was announced by Conrad Burns, acting in his capacity as moderator, that cameras and audio recording of the meeting would not be allowed, except by the press.

Response of Defendants:

Undisputed.

8. Upon a motion by a taxpayer to allow recording of the meeting, a voice vote was held.

Response of Defendants:

Undisputed.

9. Defendant Burns ordered the Coventry Police to escort certain individuals (Plaintiff Gorman) from the meeting on the grounds that he was disrupting it and/or because non-residents are not permitted to leave their seats unescorted during the meeting.

Response of Defendants:

Undisputed, although no one is permitted to leave their seats during the meeting. (Deposition of Conrad Burns at 6, a copy of which is attached hereto.)

10. Defendant Burns threatened to remove Plaintiff Carlow from the meeting on the grounds of disrupting it.

Response of Defendants:

Disputed. (Deposition of Conrad Burns at 16, a copy of which is attached hereto.)

Respectfully submitted,
Defendants, Conrad Burns and Stanley Mruk
By their attorneys

George H. Rinaldi (#5599)
Little Medeiros Kinder Bulman & Whitney PC
72 Pine Street
Providence, RI 02903
Tel: (401) 272-8080
Fax: (401) 272-8195

Dated: August 31, 2005

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

ROBERT CARLOW, JAMES PERRY, )
WILLIAM PERRY and DAVID GORMAN )
)
VS. ) Civil Action 04-325-S
)
STANLEY MRUK and CONRAD BURNS )
in their personal and official )
capacities )

Deposition of CONRAD BURNS taken on behalf of the Plaintiffs on Friday, April 29, 2005, at the offices of Gary D. Berkowitz, One James Street, Providence, Rhode Island, commencing at 1:58 p.m. before Dianne M. Dillon, Notary Public within and for the State of Rhode Island and Providence Plantations.

APPEARANCES

BY: GARY D. BERKOWITZ, ESQ. ...... FOR THE PLAINTIFFS

BY: GEORGE H. RINALDI, ESQ. ...... FOR THE DEFENDANTS

COPY

COPY

I N D E X


| DEPONENT: | PAGE |
|---|---|
| CONRAD BURNS | |
| EXAMINATION BY MR. BERKOWITZ | 3 |




FRIDAY, APRIL 29, 2005

(COMMENCING AT 1:58 P.M.)

MR. BERKOWITZ: This is the deposition of Conrad Burns, the defendant, in the federal action Carlow versus Mruk and others; and Mr. Rinaldi and I have agreed that any objections that he has made in the immediately preceding deposition of Chief Mruk, if the same question is asked of this witness, that the objection made when Chief Mruk was asked will be a standing objection and applied to any response of Mr. Burns as well whether the objection is made.

CONRAD BURNS, having been duly sworn by Notary Public, testified as follows:

EXAMINATION BY MR. BERKOWITZ

Q Good afternoon, Mr. Burns. You're here in your capacity as the moderator of the Anthony Fire Station?
A Coventry Fire District.
Q Excuse me. The Coventry Fire Station.
A Coventry Fire District.
Q Coventry Fire District. And you are, in fact, the moderator of the Coventry Fire District now?
A Yes.
Q And were you on December 9, 2003?
A Yes, sir.



Q How long have you been in that position?
A I don't know. Towards twenty years.
Q Were you appointed or elected to it?
A Elected.
Q And have you been re-elected, or do you hold that position until you vacate?
A I hold that position by appointment.
Q Is it a paid position?
A Yes. Yes, I get paid.
Q You don't have to tell me how much you're paid.
A I get paid.
Q Is it a full-time job or a part-time job?
A No, it's part time. It's once a year or if they have a special meeting, twice a year.
Q I asked Chief Mruk, but I'll ask you as well. Are you in any way related to the chief?
A No, I'm not.
Q Do you discuss fire district or fire department business with him outside of the financial or other called official meetings?
A No.
Q Again, the same question I asked Chief Mruk, do you recall the financial meeting held on December 9th, 2003?
A There was a meeting, yes.

Q Do you remember where it was held?
A Yes, Oddfellows Hall, Washington Street.
Q I believe it's a club or a service?
A It's a mason building.
Q Do you know what the seating capacity of the building is?
A Offhand, no. It's posted, and it's one of the things I have to watch for while I'm moderator.
Q Do you recall whether the building has a capacity of more or less than one hundred people?
A I don't.
Q Do you recall how many people were at the meeting?
A I don't have a count. If I had to say, roughly, sixty, seventy.
Q Was the building full, or were there empty seats?
A Empty seats.
Q According to Mr. Mruk, the seating was divided into two sections; one for voters in the fire district, and the other for nonvoters, is that correct?
A That is correct.
Q Was the voters' section fully occupied?
A No.
Q Was the nonvoters' section fully occupied?
A No.
Q Were there any signs or markers indicating which was



the voters' section and which was the nonvoters' section?
A Yes.
Q Can you describe them?
A It was a yellow tape, just marked off a section.
Q Were there signs saying voters, nonvoters, or were people supposed to know?
A People were instructed to where they were to be seated.
Q Was there any effort made to check who was a voter or a nonvoter?
A Yes, sir.
Q What efforts were made?
A When people came in the first thing they had to do was meet with the board of canvassers, people acting as my board of canvassers, to check their status as a voter; and if they were voters, they received a stamp, an ink stamp, and if they were not a voter, they were told they had to go to the nonparticipant section.
Q Did anybody escort them or check to make sure that they sat in the correct section?
A Pretty much, yes.
Q Do you recall whether during the course of the meeting anyone was asked to move out of the voters' section or into the voters' section?



A I can't say for sure that happened. I know it happened at one meeting, but I don't know if it was that one.
Q Do you recall whether or not anybody from the press, by that I mean, television or radio or newspaper, was at the meeting?
A Yes.
Q Where did they sit?
A They sat toward the rear.
Q In which section?
A By themselves.
Q Is a record kept which voters --
MR. BERKOWITZ: Strike that.
Q Is a record kept of who was in attendance at the meeting of the general public?
A I don't understand your question.
Q Say, for example, a physical list of the voters in the district with a series of checks next to the names of those residents who were present at the meeting?
A I don't know that the list is actually -- they're checked against the list, but I don't know if the list is marked.
Q At the beginning of this meeting did you announce a policy or a rule on the videotaping of the meeting?
A Yes, I did.



Q And what was the rule that you announced?
A The rule I announced was that no videos and sound recordings were to be taken of the meeting.
Q Did that apply to the press as well?
A No.
Q Can I ask you what was the basis for your making a decision between the general public and the press?
A When you say the general public --
Q The voters and nonvoters.
A The meetings I set rules of record. Before the meeting started they flashed the lights in my eyes. I've never had the problem with the lights, so I set the rule. I have an agreement with the press that they wouldn't irritate or interrupt anybody speaking at the meeting.
Q Before the meeting had you ever consulted with either --
MR. BERKOWITZ: Strike that.
Q Before the meeting had you consulted with an attorney as to the constitutionality or legality of preventing people from videotaping the proceedings?
A Yes, I did.
Q Without asking what they told you or what was said, can you tell me who that attorney was?
A I don't think I have to.

Q Would you describe yourself as friendly or unfriendly with him?
A If he says hi, I say hi. I don't usually talk to him.
Q How about James Perry; do you know if this is James Perry?
A Yes. I could mix him up.
Q Do you know his brother as well?
A I have seen his brother, yes.
Q Have you had any outside relationship with them?
A No, I do not.
Q Have you had any previous legal claims involving either one of them?
A No.
Q Do you know David Gorman?
A I know who he is now.
Q Did you know who he was on that night of the meeting?
A No.
Q Were you aware that he filed a lawsuit against the fire district previously?
A Yes.
Q Do you know what it was about?
A Yes.
Q Can you just give me a brief summary of what the subject of the suit was?
A Regarding open record violation of the open record



law.
Q Are you aware that David Gorman was ejected from the meeting on December 9?
A Yes.
Q Were you responsible for his being ejected?
A No. He was.
Q I see. Who physically removed him from the Oddfellows Hall?
A The police officer.
Q Did the police officers act on their own, or did they act on someone's request?
A On my direction.
Q On your direction. Why did you direct them to remove him?
A The rules of order of the meeting, people would remain seated in the chairs during the meeting, not wander around. If they wander I have no way of controlling who is supposed to be in the voting and nonvoting section, so the rule is appropriate that they not wander. Once the meeting minutes were started to be read, Mr. Gorman got up and started walking in circles in the back area, sitting area. I repeated three times and asked him to take his seat. He ignored me. He went to the soda machine and started dropping money in. I stopped the meeting and asked the police



officer to eject him.
Q Was Mr. Gorman a voter or a nonvoter?
A He was a nonvoter.
Q I see. Was he in the voters' section when he was removed?
A Yes.
Q Where is the vending machine in relation to the voters' and nonvoters' seating?
A The extreme end of the hall.
Q The voting and nonvoting sections were divided to the left and right side of the hall, is that accurate; the front and back?
A The whole right side, from me facing to the front of the hall, on my right was all voting. On the left, the back section was all nonvoting.
Q And the vending machine was behind all of those seats against the wall?
A Yes, but he started off by walking into the voting area.
Q But he was at the vending machine when he was removed?
A Yup. I should say, yes, sir.
Q I have no rank. You don't have to call me sir.
A I don't like "yup."
Q Was anyone later removed from the meeting?
A I don't remember. I don't think so. There may have



been.
Q I am going to just read to you from an article in The Providence Journal, a notation, another man was later removed from the meeting for making an obscene gesture to a resident who just finished addressing the meeting, is that correct?
A That is correct.
Q Do you know who that man was?
A Yes.
Q Can you tell us his name?
A The late Frank Golomb.
Q Can you spell that?
A G-O-L-O-M-B.
Q You're aware that there is an allegation in this lawsuit that there was a claim in the lawsuit that Robert Carlow was threatened with ejection from the meeting as well; do you recall whether that happened?
A I do not.
Q Did Mr. Carlow attempt to speak at the meeting?
A I don't think so. If he had, I wouldn't have allowed him to.
Q On the basis that he was not a voter?
A He's not a voter in the meeting.
Q Of the four-named plaintiffs in this lawsuit, Mr. Carlow, the Perry brothers, and Mr. Gorman, are

**CERTIFICATION**

I hereby certify that on the 31st day of August, 2005, I caused a true and accurate copy of the within Response to be mailed, by first class mail, postage prepaid, to Gary D. Berkowitz, Esq., 1 James Street, Providence, RI 02903

Marianne Gaboriault

O:\Data\8823\Dktct\Stmt\05544.doc