UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

ROBERT CARLOW, :
JAMES PERRY, :
WILLIAM PERRY, and :
DAVID GORMAN, :
Plaintiffs, :
:
v. : CA 04-325 S
:
STANLEY MRUK and :
CONRAD BURNS in their personal :
and official capacities, :
Defendants. :

REPORT AND RECOMMENDATION

David L. Martin, United States Magistrate Judge

Before the court are Plaintiff's [sic] Motion for Summary Judgment (Document ("Doc.") #15) ("Plaintiffs' Motion") and Defendants' Motion for Summary Judgment (Doc. #17) ("Defendants' Motion") (collectively the "Motions"). The Motions have been referred to me for preliminary review, findings, and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B). A hearing was conducted on October 5, 2005. After reviewing the filings, listening to oral argument, and performing independent research, I recommend that Plaintiffs' Motion be denied and that Defendants' Motion be granted.

**Facts[1] and Travel**

[1] Plaintiffs submitted a Statement of Undisputed Facts (Document ("Doc.") #16) ("Plaintiffs' SUF") in support of their motion. Defendants submitted both Defendants' Response to Plaintiffs' Statement of Undisputed Facts (Doc. #20) ("Defendants' Response") and a Statement of Undisputed Facts (Doc. #18) ("Defendants' SUF") in support of their motion. Because Plaintiffs filed no statement of disputed facts in response to Defendants' SUF, see DRI LR Cv 12.1(a)(2), superceded on January 1, 2006, by DRI LR Cv 56(a)(4), the court may take the facts as stated in Defendants' SUF as true, see DRI LR Cv 12.1(d), superceded on January 1, 2006, by DRI LR Cv 56(a)(3); see also Ruiz Rivera v. Riley, 209 F.3d 24, 28 (1st Cir. 2000)(noting

The Coventry Fire District (the "District") was established in 1889 by special legislation (the "Authorizing Act") for the purpose of preventing and fighting fires in a limited area of the Town of Coventry known as Anthony. Defendants' Statement of Undisputed Facts (Doc. #18) ("Defendants' SUF") ¶ 1. The District's fire department is known as the Anthony Fire Department. Id. ¶ 7. Plaintiffs Robert Carlow and James Perry are firefighters in the Anthony Fire Department.[2] Complaint (Doc. #1) ¶¶ 1-2; Answer (Doc. #5) ¶ 1-2; Plaintiffs' Statement of Undisputed Facts (Doc. #16) ("Plaintiffs' SUF") ¶¶ 1-3; Defendants' Response to Plaintiffs' Statement of Undisputed Facts (Doc. #20) ("Defendants' Response") ¶¶ 1-3. Plaintiff William Perry is a "former Coventry firefighter."[3] Complaint ¶ 3; Answer ¶ 3. Plaintiffs allege that Plaintiff David Gorman is also a "Coventry firefighter."[4] Complaint ¶ 4. Plaintiffs are not

---

that failure to comply with local rule "justifies the court's deeming the facts presented in the movant's statement of undisputed facts admitted and ruling accordingly")(citing Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 95 (1st Cir. 1996)); Anabell's Ice Cream Corp. v. Town of Glocester, 925 F.Supp. 920, 924 (D.R.I. 1996)(noting that "movant's version of the facts may be ... taken as true," given failure to contest statement of undisputed facts as required by local rule).

[2] Robert Carlow is also the president of the Coventry Firefighters Union, Local 3240 of the International Association of Firefighters. See Complaint (Doc. #1) ¶ 1; Answer (Doc. #5) ¶ 1.

[3] According to Chief Mruk, William Perry was a volunteer firefighter in the Anthony Fire Department "prior to getting employment elsewhere." Deposition of Stanley Mruk ("Mruk Dep.") at 13.

[4] Defendants deny that Mr. Gorman is a "firefighter in the Anthony Fire Department of the Coventry Fire District." Answer ¶ 4. At his deposition, Chief Mruk stated that Mr. Gorman "is a firefighter in the Tiogue Fire Department." Mruk Dep. at 14. The Tiogue Fire Department is a department in another district in the Town of Coventry. Id.

residents of the District. Defendants' SUF ¶¶ 17, 19, 21, 23.[5] Defendant Stanley Mruk ("Chief Mruk") is the Chief of the District. Id. ¶ 5; see also Complaint ¶ 5. Defendant Conrad Burns is the District's auditor and moderator.[6] Defendants' SUF ¶ 4; Complaint ¶ 7.

In accordance with the terms of the Authorizing Act, the District holds its annual meeting on the second Tuesday in December. Defendants' SUF ¶ 2. During the annual meeting, the residents of the District adopt a budget and tax rate for the upcoming year, elect officers to vacant positions, and vote on resolutions governing the operation of the District and the Anthony Fire Department. Id. ¶ 7. Residents of the District are allowed to speak after coming to the podium and giving their names and addresses. Id. ¶ 14. Nonresidents are allowed to attend the annual meeting, but they are not allowed to speak or otherwise participate and must sit in a separate area from the voters. Id. ¶ 16. Pursuant to Rhode Island law, the District's annual meetings are run by the District's moderator, Mr. Burns. Id. ¶ 4. Any rules and decisions made by Mr. Burns are subject to being overruled by a majority vote of the voters attending the annual meeting. Id. ¶ 8. Chief Mruk presents reports and the proposed budget and responds to questions from District residents at the annual meeting. Id. ¶ 5.

The 2003 annual meeting was held on December 9, 2003. Id. ¶ 3; see also Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment ("Defendants' S.J. Mem."), Exhibit ("Ex.") 4 (Minutes of Coventry Fire District 2003 annual meeting)

---

[5] In their memorandum Plaintiffs concede that they are "not residents of the District ...." Memorandum of Law in Support of Summary Judgment ("Plaintiffs' Mem.") at 1.

[6] Mr. Burns is also a member of the safety committee, see Deposition of Conrad Burns ("Burns Dep.") at 19, as is Chief Mruk, see id. at 20.

("Minutes") at 1. Plaintiffs were present at the meeting. See Defendants' SUF ¶¶ 18, 20, 22, 24; see also Complaint ¶ 12. At the start of the meeting, Mr. Burns announced the rules of order, which included prohibitions on nonresidents speaking or otherwise participating in the meeting, Defendants' SUF ¶ 9, and videotaping[7] of the meeting except by members of the press, id. ¶ 11. A motion was made by a voter to reverse the latter prohibition, but it was upheld on a hand vote.[8] Id. ¶ 12. It is undisputed that at some point Mr. Gorman was escorted from the meeting by the Coventry Police. See Complaint ¶ 21; Plaintiffs' SUF ¶ 9; Defendants' Response ¶ 9. Plaintiffs further allege that Mr. Carlow was threatened with removal from the meeting.[9] Complaint ¶ 24; Plaintiffs' SUF ¶ 10.

Plaintiffs filed the instant Complaint (Doc. #1) on July 29, 2004. The Complaint contains a single count in which Plaintiffs allege that "Defendants' actions violate 42 U.S.C. §1983 and the Plaintiffs' First Amendment rights." Complaint ¶ 32. Plaintiffs request the following relief: (a) "declaratory relief establishing the right of the Plaintiffs and others to videotape or otherwise record or photograph public meetings, be in

---

[7] Mr. Burns testified that he believed the rule he announced was "no videotaping or sound recordings." Burns Dep. at 10.

[8] Plaintiffs state that "[u]pon a motion by a taxpayer to allow recording of the meeting, a voice vote was held." Plaintiffs' SUF ¶ 8. Defendants do not dispute this statement. See Defendants' Response ¶ 8. According to Mr. Burns, "[i]t was originally a voice vote, and it was not clear to the chair, and the chair asked for a show of hands." Burns Dep. at 17. A hand vote was then taken. See id.

[9] Although Defendants deny that Mr. Carlow was threatened with removal from the meeting, Defendants' Response ¶ 10, Mr. Burns stated during his deposition that he did not recall whether Mr. Carlow was threatened with ejection from the meeting, Burns Dep. at 16. In their Answer, Defendants "admit that Defendant Burns warned Plaintiff Carlow that he would be removed from the meeting if he continued to disrupt the meeting." Answer ¶ 24.

attendance and to speak at Fire District Meetings in the same manner and circumstances as other members of the public," Complaint at 3; (b) compensatory and punitive damages, id.; (c) reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, id.; and (d) "any other appropriate relief," id. On September 24, 2004, Defendants filed their Answer (Doc. #5) to the Complaint.

Plaintiffs' Motion (Doc. #15), with supporting memorandum, and Plaintiffs' SUF (Doc. #16) were filed on July 29, 2005, as were Defendants' Motion (Doc. #17), memorandum in support thereof, and Defendants' SUF (Doc. #18). On August 31, 2005, Defendants filed an Objection to Plaintiffs' Motion for Summary Judgment (Doc. #19) ("Defendants' Objection"), supporting memorandum, and Defendants' Response to Plaintiffs' Statement of Undisputed Facts (Doc. #20) ("Response to Plaintiffs' SUF"). Plaintiffs have not filed a response to Defendants' Motion or Defendants' SUF. See Docket.

**Discussion**

**I. Summary judgment standard**

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Kearney v. Town of Wareham, 316 F.3d 18, 21 (1st Cir. 2002)(quoting Fed. R. Civ. P. 56(c)); accord ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party. A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000)(quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)).

In ruling on a motion for summary judgment, the court must examine the record evidence "in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party." Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir. 2000)(citing Mulero-Rodriguez v. Ponte, Inc., 98 F.3d 670, 672 (1st Cir. 1996)). "[W]hen the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage." Coyne v. Taber Partners I, 53 F.3d 454, 460 (1st Cir. 1995). Furthermore, "[s]ummary judgment is not appropriate merely because the facts offered by the moving party seem more plausible, or because the opponent is unlikely to prevail at trial. If the evidence presented is subject to conflicting interpretations, or reasonable men might differ as to its significance, summary judgment is improper." Gannon v. Narragansett Elec. Co., 777 F. Supp. 167, 169 (D.R.I. 1991)(citation and internal quotation marks omitted).

The non-moving party, however, may not rest merely upon the allegations or denials in its pleading, but must set forth specific facts showing that a genuine issue of material fact exists as to each issue upon which it would bear the ultimate burden of proof at trial. See Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 53 (1st Cir. 2000)(citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "[T]o defeat a properly supported motion for summary judgment, the nonmoving party must establish a trial-worthy issue by presenting enough competent evidence to enable a finding favorable to the nonmoving party." ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002)(quoting LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 842 (1st Cir. 1993)) (alteration in original)(internal quotation marks omitted).

## I. Defendant Mruk

Defendants argue that the allegations against Chief Mruk should be dismissed because under Rhode Island law he played no role whatsoever in the conduct of the December 9, 2003, annual meeting and should not be held liable for the decisions of Defendant Burns. See Defendants' S.J. Mem. at 5-6. Plaintiffs claim that "all of [Mr. Burns'] actions described herein were taken under the instruction, and with the approval of Defendant Stanley Mruk." Complaint ¶ 7.

The Rhode Island General Laws provide that "[i]n all meetings of the electors or voters in a town, representative district, or voting district, the moderator of the meeting shall preside." R.I. Gen. Laws § 45-3-17 (1999 Reenactment). Further, "[e]very moderator has the power to manage and regulate the business of each meeting, conforming to law, and to maintain peace and good order at the meeting." R.I. Gen. Laws § 45-3-18 (1999 Reenactment); see also Pine v. McGreavy, 687 A.2d 1244, 1245 (R.I. 1997)(citing § 45-3-18).

According to Defendants' SUF,

> 5. Stanley J. Mruk, the Chief of the Coventry Fire District, plays no role in the conduct of the annual meeting, including the 2003 Annual Meeting, but does present reports, the proposed budget and respond to questions from the District's residents.
>
> 6. All decisions made by Moderator Burns with respect to establishing and/or enforcing the rules of order governing the 2003 Annual Meeting were made without input from or consultation with Chief Mruk.

Defendants' SUF ¶¶ 5-6. Plaintiffs did not file a response to Defendants' SUF. The court, therefore, accepts as true Defendants' statements that Chief Mruk played no role in the conduct of the 2003 annual meeting and that all decisions made by Mr. Burns were made without input from or consultation with Chief

Mruk. See DRI LR Cv 12.1(d) ("In determining any motion for summary judgment, the Court may assume that the facts as claimed by the moving party are admitted to exist without controversy except as and to the extent that such facts are controverted by affidavit filed in opposition to the motion, or by other evidentiary materials which the court may consider under Rule 56 of the Federal Rules of Civil Procedure."), superceded on January 1, 2006, by DRI LR Cv 56(a)(3); see also Ruiz Rivera v. Riley, 209 F.3d 24, 28 (1st Cir. 2000) (noting that failure to comply with local rule "justifies the court's deeming the facts presented in the movant's statement of undisputed facts admitted and ruling accordingly")(citing Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 95 (1st Cir. 1996)); Anabell's Ice Cream Corp. v. Town of Glocester, 925 F.Supp. 920, 924 (D.R.I. 1996) (noting that, given failure to contest statement of undisputed facts as required by local rule, "movant's version of the facts may be ... taken as true").

Moreover, both Defendants testified at their depositions that, although they knew each other, they did not speak about the conduct of the meeting. See Deposition of Stanley Mruk ("Mruk Dep.") at 4-5;[10] Deposition of Conrad Burns ("Burns Dep.") at 4.[11]

---

[10] Q ... How long have you known Mr. Burns?
A All my life.
Q Is he related to you?
A No.
Q Outside of the public meetings, do you ever meet with Mr. Burns to discuss the fire department's rules or policies?
A Not that I can remember.

Mruk Dep. at 4-5.

[11] Q I asked Chief Mruk, but I'll ask you as well. Are you in any way related to the chief?
A No, I'm not.
Q Do you discuss fire district or fire department business with him outside of the financial or other

Chief Mruk additionally testified that it was the moderator's function to decide what went on at the meeting, see Mruk Dep. at 7-9, and that until it was his turn on the agenda he did not pay attention to what was happening at the meeting and, instead, sat at a table in the front of the hall reviewing his budget and preparing what he would say in defense thereof, see id. at 11, 24. Regarding Mr. Gorman, Chief Mruk stated that he did not request that the police officer remove Mr. Gorman, id. at 16-17, but "heard he was ejected from the meeting," id. at 16, and "heard a commotion going on, but that's all," id. As for Mr. Carlow, Chief Mruk testified that he did not recall Mr. Carlow being threatened with ejection from the meeting, id. at 17, and that he "didn't see where [Mr. Carlow] was," id. at 23, when the latter got up to go to the rest room, see id., and that he did not recall whether Mr. Carlow had asked any questions at the meeting, id., or whether Mr. Carlow and the Perrys were prevented from speaking or asking questions during the meeting, id. at 21.

Plaintiffs, by contrast, provide no support whatsoever for their allegation that "all of [Mr. Burns'] actions described herein were taken under the instruction, and with the approval of Defendant Stanley Mruk," Complaint ¶ 7. The Court of Appeals for the First Circuit has held that "[e]ven in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 95 (1st Cir. 1996)(quoting Goldman v. First Nat'l Bank of Boston, 985 F.2d 1113, 1116 (1st Cir. 1993)(quoting Medina-Munoz

---

called official meetings?
A No.

Burns Dep. at 4.

v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990))) (alteration in original).

Notwithstanding Plaintiffs' use of the plural "Defendants" in the Complaint, see Complaint ¶¶ 17-18, 21, 30, 32, and statement that "inasmuch as the Fire District and Stanley Mruk personally have previously infringed upon the rights of at least one of the plaintiffs ... Mruk's and Burns' actions complained of herein are retaliatory," id. ¶ 19, the only "action" specifically ascribed to Chief Mruk in the Complaint is the unsupported and conclusory allegation that he instructed Mr. Burns regarding the conduct of the annual meeting and approved all of Mr. Burns' actions at the December 9, 2003, annual meeting, see Complaint ¶ 7. This is an insufficient basis on which to hold Chief Mruk liable for Mr. Burns' actions. I therefore recommend that, as to Chief Mruk, Defendants' Motion be granted and Plaintiffs' Motion be denied.

## II. Defendant Burns

### A. Absolute legislative immunity

Defendants argue that the claims against Mr. Burns should be dismissed pursuant to the legislative immunity doctrine, since he "did nothing more than carry out the will of the voters and ensure that they could carry out their task of voting on the District's business in an orderly and efficient fashion ...." Defendants' S.J. Mem. at 7. Plaintiffs challenge the acts of Mr. Burns in prohibiting videotaping of the December 9, 2003, annual meeting except by members of the press, see Complaint ¶¶ 14-18; Plaintiffs' SUF ¶¶ 7-8, and ordering and threatening the ejection of Mr. Gorman and Mr. Carlow, respectively, from the meeting,[12]

---

[12] As noted previously, see n.9, the parties dispute whether Mr. Carlow was actually threatened with ejection from the annual meeting. However, "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of

see Complaint ¶¶ 21-25, 27; Plaintiffs' SUF ¶¶ 9-10. However, they do not address the question of whether Mr. Burns is entitled to absolute legislative immunity. See Memorandum of Law in Support of Summary Judgment ("Plaintiffs' Mem.") at 5 (discussing only issue of qualified immunity).

**1. General principles**

> Officials acting in a legislative capacity have absolute immunity from suit and liability under § 1983. The function of such immunity is to insure that the legislative function may be performed independently without fear of outside interference. Legislative immunity applies to local legislators as well as to their state and federal counterparts, and it applies when these officials act in a field where legislators traditionally have power to act.

Acevedo-Garcia v. Vera-Monroig, 204 F.3d 1, 7-8 (1st Cir. 2000) (internal citations and quotation marks omitted); accord Bogan v. Scott-Harris, 523 U.S. 44, 54, 118 S.Ct. 966, 972, 140 L.Ed.2d 79 (1998)("Local legislators are entitled to absolute immunity from § 1983 liability for their legislative activities."). The doctrine "necessarily focuses on particular acts or functions, not on particular actors or functionaries," Nat'l Ass'n of Soc. Workers v. Harwood, 69 F.3d 622, 630 (1st Cir. 1995), and "extends to legislative acts performed by non-legislators," id.

---

*material* fact." Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 94 (1st Cir. 1996)(quoting Anderson v. Liberty Lobby, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986)). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party. A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000). Here, the factual dispute would not affect the outcome of the suit because Defendants admit that the same rules of order which Mr. Burns applied to Mr. Gorman would also have applied to Mr. Carlow, see Burns Dep. at 16 (stating that Mr. Carlow would not have been allowed to speak at the meeting because he is not a voter); see also Defendants' SUF ¶¶ 9, 11, 16, 17-18; Answer ¶¶ 24-25.

However, the administrative or executive actions of legislators are not entitled to protection. Acevedo-Garcia v. Vera-Monroig, 204 F.3d at 8. "An official's bad motivation, or 'unworthy purpose,' does not affect the immunity privilege so long as the actions fall within the ambit of protected legislative activity." Id. (quoting Tenney v. Brandhove, 341 U.S. 367, 377, 71 S.Ct. 783, 95 L.Ed. 1019 (1951)); accord Bogan v. Scott-Harris, 523 U.S. at 54, 118 S.Ct. at 973 ("Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it.").

Accordingly, the question of whether Mr. Burns' actions are protected by absolute legislative immunity turns on whether they were legislative or administrative. See Acevedo-Garcia v. Vera-Monroig, 204 F.3d at 8. The First Circuit has adopted a two-part analysis for use in determining whether an act is legislative or administrative:

> First, if the facts underlying the decision are generalizations concerning a policy or state of affairs, the decision is legislative. If the decision stems from specific facts relating to particular individuals or situations, the act is administrative. Second, the court must consider the particularity of the impact of the state of action. If the action involves establishment of a general policy, it is legislative; if it single[s] out specifiable individuals and affect[s] them differently from others, it is administrative.

Id. at 9 (alterations in original)(internal citations and quotation marks omitted).

### 2. Application

#### a. Prohibition on videotaping

Mr. Burns, in his capacity as moderator of the District, at the start of the 2003 annual meeting announced the rules of order, including the prohibition on videotaping of the meeting except by members of the press. See Defendants' SUF ¶¶ 4, 11;

Burns Dep. at 3, 7-8; Defendants' S.J. Mem., Ex. 3 (Affidavit of Conrad Burns) ("Burns Aff.") ¶¶ 1-2. A motion to overrule the moderator and reverse the prohibition on videotaping by members of the public was made by a voter, but the motion was defeated and the prohibition upheld on a hand vote. Defendants' SUF ¶¶ 12-13; see also Burns Dep. at 17-18. No motion to reconsider or to take another vote by paper ballot followed. See Defendants' SUF ¶ 13.

It is clear from Mr. Burns' deposition that the institution of the rule of order regarding videotaping did not "stem[] from specific facts relating to particular individuals," Acevedo-Garcia v. Vera-Monroig, 204 F.3d at 9, but, rather, reflected a "generalization[] concerning a policy or state of affairs," id. Mr. Burns testified at his deposition that he established this rule of order for two reasons. See Burns Dep. at 10. First, he stated that before the meeting started lights were flashed in his eyes, which had not been a problem previously. See id. at 8, 10. Second, he noted that he felt videotaping the meeting would intimidate the taxpayers, id. at 10, because he "had someone complain before when they [sic] saw video taping that they didn't like it." Id. Although Plaintiffs allege that Mr. Carlow, Mr. James Perry, and Mr. William Perry "brought video cameras to the meeting for the purpose of recording it on videotape," Complaint ¶ 13, and that "the intent of the defendants was to stifle and intimidate the Plaintiffs and others from exercising their First Amendment rights to question or criticize Defendants' performance in their official capacities," id. ¶ 18, there is no evidence that Mr. Burns instituted the prohibition on videotaping to prevent Plaintiffs from doing so. On the contrary, the rule of order applied to all members of the public, not just Plaintiffs. Thus, the rule of order "involve[d] establishment of a general policy," Acevedo-Garcia v. Vera-Monroig, 204 F.3d at 9, and did

not "single[] out specifiable individuals and affect[] them differently from others," id. As for the distinction between the public and the press, Mr. Burns explained at his deposition that he "ha[d] an agreement with the press that they wouldn't irritate or interrupt anybody speaking at the meeting." Burns Dep. at 8.

Moreover, the rule of order prohibiting videotaping except by the press was endorsed by a majority of the voters when they rejected the motion to overrule the prohibition. In National Association of Social Workers v. Harwood, the First Circuit stated that "the doctrine of legislative immunity must protect legislators and legislative aides who do no more than carry out the will of the body by enforcing the rule as a part of their official duties," 69 F.3d at 631. There, the plaintiffs sued the Speaker of the Rhode Island House of Representatives and the House's head doorkeeper,[13] challenging their enforcement of a House rule banning lobbyists from the floor of the House while the House was in session. Nat'l Ass'n of Soc. Workers v. Harwood, 69 F.3d at 624-25. The First Circuit elaborated that:

> We think it is beyond serious dispute that enforcing a duly enacted legislative rule which prohibits lobbying on the House floor during House sessions is well within the legislative sphere. Such a restriction necessarily affects the manner in which the House conducts its most characteristic legislative functions, *e.g.*, debating and voting. A rule that colors the very conditions under which legislators engage in formal debate is indubitably part and parcel of the legislative process, and the acts of House officials (whether or not elected members) in enforcing it are therefore fully protected against

---

[13] The First Circuit "reject[ed] the plaintiffs' attempt to differentiate the Speaker from the doorkeeper, based on the fact that the latter is not a legislator," Nat'l Ass'n of Soc. Workers v. Harwood, 69 F.3d 622, 632 n.10 (1st Cir. 1995), because his "actions in keeping the House floor unsullied were performed by virtue of an express delegation of authority to him as part of the House's staff support apparatus, under the auspices of the Speaker and the legislative body as a whole," id.

> judicial interference by the doctrine of legislative immunity.

Id. at 632.

Such is the case in the instant matter. Mr. Burns was enforcing a rule of order which was designed to ensure that he could conduct the annual meeting without distraction and that the voters could speak without feeling intimidated and which had been endorsed by a majority of the voters. His actions, therefore, are protected by absolute legislative immunity.

**b. Removal and warning**

At the start of the December 9, 2003, annual meeting, Mr. Burns also announced the rule of order which prohibited nonresidents from speaking or otherwise participating in the meeting. Defendants' SUF ¶¶ 9; Burns Aff. ¶ 3. Although any rule of order announced by the moderator is subject to being overruled by a majority of the voters attending the annual meeting on a motion by a voter, see Defendants' SUF ¶¶ 8, 10, no such motion was made to overturn the rule prohibiting nonresidents from speaking or otherwise participating, see id. ¶ 10.

Consistent with this rule of order, nonresidents and voters must sit in separate sections.[14] Defendants' SUF ¶ 16; see also Burns Dep. at 5. Mr. Burns testified that the sections were "marked off," Burns Dep. at 6, by yellow tape and that people were instructed where to sit, id. Asked whether any effort was

---

[14] According to § 45-3-26 of the Rhode Island General Laws:

> All town meetings are open to the public, including representatives of the press and news media; provided[] that, in the event that there are space constraints, voters shall be admitted to the meetings before non-voters. Non-voters may be seated or assigned to a separate area as indicated by the moderator.

R.I. Gen. Laws § 45-3-6 (1999 Reenactment).

made to check who was a voter or nonvoter, Mr. Burns responded affirmatively and described the procedure:

> When people came in the first thing they had to do was meet with the board of canvassers, people acting as my board of canvassers, to check their status as a voter; and if they were voters, they received a stamp, an ink stamp, and if they were not a voter, they were told they had to go to the nonparticipant section.

Burns Dep. at 6. In response to a question regarding whether anyone checked to make sure people sat in the correct section, Mr. Burns stated "[p]retty much, yes." Id.

Mr. Burns further testified that as part of the rules of order for the meeting, people were to remain seated during the meeting and "not wander around." Burns Dep. at 14; see also Minutes at 1 (listing "orderly conduct" among rules of order announced by Mr. Burns). According to Mr. Burns, "[i]f they wander I have no way of controlling who is supposed to be in the voting and nonvoting section, so the rule is appropriate that they not wander." Burns Dep. at 14.

Mr. Burns described the events leading to Mr. Gorman's removal from the 2003 annual meeting as follows:

> Once the meeting minutes were started to be read, Mr. Gorman got up and started walking in circles in the back area, sitting area. I repeated three times and asked him to take his seat. He ignored me. He went to the soda machine and started dropping money in. I stopped the meeting and asked the police officer to eject him.

Burns Dep. at 14-15. On questioning by Plaintiffs' counsel, Mr. Burns elaborated that Mr. Gorman was not a voter and was in the voters' section when he was removed. Id. at 15. He then clarified that the soda machine was behind the seats against the wall at the "extreme end of the hall," id., but that Mr. Gorman "started off by walking into the voting area," id.

As for Plaintiffs' allegation that Mr. Carlow was threatened

with removal from the meeting, Mr. Burns testified as follows:

Q You're aware that there is an allegation in this lawsuit ... that Robert Carlow was threatened with ejection from the meeting as well; do you recall whether that happened?
A I do not.
Q Did Mr. Carlow attempt to speak at the meeting?
A I don't think so. If he had, I wouldn't have allowed him to.
Q On the basis that he was not a voter?
A He's not a voter in the meeting.
....
Q Are you aware that Mr. Carlow maintains that he was threatened with ejection because he got up to go to the rest room?
A No.

Burns. Dep. at 16-18; see also Answer ¶ 24 (denying that Mr. Burns threatened to have Mr. Carlow removed from the meeting, but admitting that Mr. Burns "warned Plaintiff Carlow that he would be removed from the meeting if he continued to disrupt the meeting"). The court assumes for purposes of this Report and Recommendation that Mr. Carlow was at least warned that he could be removed from the December 9, 2003, annual meeting.[15]

It again appears that Mr. Burns' actions in enforcing the rules of order "fall within the ambit of protected legislative activity." Acevedo-Garcia v. Vera-Monroig, 204 F.3d at 8; cf. Collinson v. Gott, 895 F.2d 994, 1008 (4th Cir. 1990)(Wilkinson, J., concurring in judgment)("Conducting a public meeting to discuss plans for the reorganization of county government fits comfortably within the definition of the legislative function originally referenced by Justice Frankfurter in Tenney [v. Brandhove, 341 U.S. 367, 378, 71 S.Ct. 783, 789, 95 L.Ed. 1019 (1951)] ...."). Similar to the instant matter, Collinson v. Gott involved "a citizen's claim that his first amendment rights were

---

[15] As noted previously, see n.12, the court has concluded that this dispute is not material.

violated when the president of a board of county commissioners ruled him out of order while he was addressing a called public meeting and then had him evicted." 895 F.2d at 995. At the beginning of the meeting the defendant, the presiding officer at the meeting, had announced the rules of order, which included a requirement that members of the public who wished to address the board sign up on a master list, a time limitation of two minutes, and, allegedly, a warning that remarks be confined to the specific question at issue and that speakers avoid discussion of personalities. See id. at 996. The defendant called the plaintiff out of order for speaking on a topic which "ha[d] nothing to do with the [topic at hand]," id., and ordered him removed from the meeting, see id. Judge Wilkinson determined that the defendant was "entitled to absolute immunity from suit for this single discretionary act," id. at 1005, reasoning that "[p]ublic meetings are preeminently political institutions. Their character will be profoundly altered and their vitality lost if they are beset by litigation based on a presiding officer's single discretionary act," id. at 1011. Moreover, Judge Wilkinson wrote,

> Every presiding official in a public meeting must, at some time, make a spontaneous judgment as to whether a speaker is abusing the forum. Section 1983 was not intended to make actionable isolated incidents in which politicians show poor judgment at a public meeting in calling someone out of order.

Id. at 1005. To hold otherwise would "not only create a vehicle for every disgruntled speaker to force his opponents into federal court; it will require local officials to second guess themselves every time they raise the gavel." Id. at 1005-06; see also id. at 1006 ("Permitting § 1983 liability here will create a disincentive for presiding officers to exercise the discipline essential to the conduct of public business and the maintenance

of vigorous debate."). Judge Wilkinson thus concluded that the defendant was "was engaged in a legislative function," id. at 1008, that he "was acting in furtherance of his duties as ... chairman of the meeting when he ruled [the plaintiff] out of order," id., and that the action was "within the scope of [the defendant's] authority as a presiding officer," id. According to Judge Wilkinson, "[t]his was not an administrative action .... To the contrary, [the defendant's] discretionary act was an integral part of the legislative process. The flow of information through that process could be severely jeopardized if every public meeting carried with it the threat of civil liability, not to mention punitive damages." Id.

The same principles apply here. Mr. Burns, in ordering that Mr. Gorman be removed and warning Mr. Carlow that he, too, could be removed, was acting in his capacity as moderator "to maintain peace and good order at the meeting." R.I. Gen. Laws § 45-3-18; see also R.I. Gen. Laws § 45-3-19,[16] and enforcing the rules of order. Although Plaintiffs argue that "[t]he claim of the Defendants that they were afraid that the Plaintiffs would move into the voters['] section and attempt to vote constituted disruption does not bear scrutiny," Plaintiffs' Mem. at 4 (internal citation omitted), Mr. Burns' deposition testimony makes it abundantly clear that he was enforcing a general policy,

[16] Section 45-3-19 provides that:

> If any person conducts himself or herself in a disorderly manner in any town, representative district, or voting district meeting, the moderator may order that person to withdraw from the meeting; and, on the person's refusal, may order the town sergeant, or any constable present, or any other persons, to take him or her from the meeting and to confine him or her in some convenient place until the meeting is adjourned. The person refusing to withdraw shall, for each offense, be fined not exceeding twenty dollars ($20.00).

R.I. Gen. Laws § 45-3-19 (1999 Reenactment).

see Acevedo-Garcia v. Vera-Monroig, 204 F.3d at 9. Mr. Burns testified that the rule of order prohibiting nonresidents from speaking was not adopted specifically for the 2003 annual meeting, but, rather, was an "ongoing policy." Burns Dep. at 11. In response to a question regarding whether the policy existed in writing or was simply an oral one, Mr. Burns stated that it was "provided for in the charter." Id. Although Plaintiffs allege that "[o]ther attendees at the meeting were permitted to come and go freely," Complaint ¶ 26, they have provided no support for this allegation, see Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 95 (1st Cir. 1996)(noting that summary judgment may be appropriate if nonmoving party rests merely upon "conclusory allegations, improbable inferences, and unsupported speculation").

Moreover, while Plaintiffs contend that "the real reason for the Defendants' actions was to intimidate the Plaintiffs from questioning firefighting practices or the incumbent management of the Anthony Fire District," Plaintiffs' Mem. at 4-5, they have presented no evidence from which the court could conclude that Mr. Burns "targeted specific individuals," Acevedo-Garcia v. Vera-Monroig, 204 F.3d at 8, for their views. Although Plaintiffs claim that Mr. Gorman and Mr. Carlow attempted to speak at the meeting, Complaint ¶ 20, Defendants state that neither Mr. Gorman nor Mr. Carlow identified himself as a resident of, or voter in, the District prior to the start of the 2003 annual meeting, Defendants' SUF ¶¶ 18, 24, which Plaintiffs have not disputed. Mr. Burns testified that if Mr. Carlow had attempted to speak at the meeting, he would not have been allowed to do so because he was not a voter. Burns Dep. at 16; see also Defendants' SUF ¶ 25 (stating that "[a] member of the Town Council of the Town of Coventry, Rhode Island, who wished to speak at the 2003 Annual Meeting, could not do so because he was

not a resident of, or voter in, the District"); Burns Aff. ¶ 6 ("I am aware of several non-residents other than the Plaintiffs in this case, including a member of the Coventry Town Council, who wished to speak at the Annual Meeting but were unable to do so because of the residents only rule.").

The court concludes that Mr. Burns' actions in enforcing the rule of order prohibiting nonresidents from speaking and its corollaries at the December 9, 2003, annual meeting were legislative in nature and are, therefore, protected by absolute legislative immunity. Cf. Nat'l Ass'n of Soc. Workers v. Harwood, 69 F.3d at 632 ("A rule that colors the very conditions under which legislators engage in formal debate is indubitably part and parcel of the legislative process, and the acts of House officials (whether or not elected members) in enforcing it are therefore fully protected against judicial interference by the doctrine of legislative immunity."). I therefore recommend that Defendants' Motion, as it pertains to Mr. Burns, be granted on this ground and that Plaintiffs' Motion be denied.

**B. Qualified immunity**

Alternatively, Defendants argue that "[t]o the extent that this complaint is not dismissed pursuant to the absolute immunity doctrine, it should be dismissed pursuant to the qualified immunity doctrine." Defendants' S.J. Mem. at 10. Specifically, Defendants contend that "[b]ecause the plaintiffs, as non-residents, had no First Amendment right to speak at the meeting, and because there is no First Amendment right to videotape public meetings," id. at 11, Plaintiffs' allegations that their First Amendment rights were violated when they were not allowed to speak at the 2003 annual meeting or videotape the meeting "must fail," id. Plaintiffs assert that "[g]iven the history between the parties, and the admitted facts surrounding Gorman's removal and Carlow's threatened removal, there can be no reasonable basis

to provide the Defendants with any cloak of qualified immunity." Plaintiffs' Mem. at 5.

### 1. General principles

The Court of Appeals for the First Circuit has stated that "a public actor's liability under section 1983 'is not absolute: the doctrine of qualified immunity provides a safe harbor for a wide range of mistaken judgments.'" Cox v. Hainey, 391 F.3d 25, 29 (1st Cir. 2004)(quoting Hatch v. Dep't for Children, Youth & Their Families, 274 F.3d 12, 19 (1st Cir. 2001)); see also Riverdale Mills Corp. v. Pimpare, 392 F.3d 55, 60 (1st Cir. 2004) ("Qualified immunity is designed to protect most public officials: 'it provides ample protection to all but the plainly incompetent or those who knowingly violate the law.'")(quoting Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). "[T]he doctrine of qualified immunity protects public officials from civil liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Cox v. Hainey, 391 F.3d at 29 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)); see also Veilleux v. Perschau, 101 F.3d 1, 2 (1st Cir. 1996)("Qualified immunity protects public officials from section 1983 liability so long as they 'acted reasonably under settled law in the circumstances.'")(quoting Hunter v. Bryant, 502 U.S. 224, 228, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991)(per curiam)).

The United States Supreme Court has stated, and the First Circuit has reiterated, that "[q]ualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.' The privilege is 'an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.'" Saucier v. Katz, 533 U.S. 194, 200-01, 121 S.Ct. 2151,

2156, 150 L.Ed.2d 272 (2001)(quoting Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985))(internal citation omitted); see also Cox v. Hainey, 391 F.3d at 29 (same). Thus, the applicability of qualified immunity "should be determined at the earliest practicable stage in the case." Cox v. Hainey, 391 F.3d at 29.

The First Circuit has construed the Supreme Court's framework for analyzing qualified immunity to consist of three inquiries:

> (i) whether the plaintiff's allegations, if true, establish a constitutional violation; (ii) whether the constitutional right at issue was clearly established at the time of the putative violation; and (iii) whether a reasonable officer, situated similarly to the defendant, would have understood the challenged act or omission to contravene the discerned constitutional right.

Cox v. Hainey, 391 F.3d at 29-30. The question of whether Plaintiffs has alleged facts which show that Mr. Burns' actions violated a constitutional right should be treated as a "threshold question." Saucier v. Katz, 533 U.S. at 201, 121 S.Ct. at 2156; see also Cox v. Hainey, 391 F.3d at 30. "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001).

**2. Application**

**a. Prohibition on nonresidents speaking**

"It is axiomatic that not every limitation on freedom of expression insults the First Amendment. A curtailment of speech violates the Free Speech Clause only if the restricted expression is, in fact, constitutionally protected and if the government's justification for the restriction is inadequate." Berner v. Delahanty, 129 F.3d 20, 25 (1st Cir. 1997)(internal citations

omitted). The court is mindful that the standards to be applied in determining whether a private speaker has been unconstitutionally excluded from use of a forum "depend on the nature of the forum." Good News Club v. Milford Cent. Sch., 533 U.S. 98, 106, 121 S.Ct. 2093, 2099, 150 L.Ed.2d 151 (2001); see also Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. 788, 800, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985)("[T]he extent to which the Government can control access depends on the nature of the relevant forum.").

The United States Supreme Court has identified three types of fora: "the traditional public forum, the public forum created by government designation, and the nonpublic forum." Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. at 802, 105 S.Ct. at 3449; see also Ridley v. Massachusetts Bay Transp. Auth., 390 F.3d 65, 75 (1st Cir. 2004)(same). Courts have also used the term "limited public forum," see, e.g., Good News Club v. Milford Cent. Sch., 533 U.S. at 106, 121 S.Ct. at 2100; Fund for Cmty. Progress, Inc. v. Kane, 943 F.2d 137, 138 (1st Cir. 1991), which the First Circuit has equated with a nonpublic forum, Ridley v. Massachusetts Bay Transp. Auth., 390 F.3d at 76 n.4 ("We adopt the usage equating limited public forum with non-public forum ....").

> [S]peakers can be excluded from a public forum only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest. Similarly, when the Government has intentionally designated a place or means of communication as a public forum speakers cannot be excluded without a compelling governmental interest. Access to a nonpublic forum, however, can be restricted as long as the restrictions are reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view.

Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. at 800, 105 S.Ct. at 3448)(second alteration in original)(internal

citation and quotation marks omitted); see also Berner v. Delahanty, 129 F.3d at 26 (same).

Here, the parties agree that the 2003 annual meeting was a limited public forum, see Defendants' S.J. Mem. at 15-16; Plaintiffs' Mem. at 3; see also Good News Club v. Milford Cent. Sch., 533 U.S. at 106, 121 S.Ct. 2100 (assuming limited public forum because parties agreed that limited public forum had been created), which in the First Circuit is treated as a nonpublic forum, see Ridley v. Massachusetts Bay Transp. Auth., 390 F.3d at 76 n.4.

> Implicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of subject matter and speaker identity. These distinctions may be impermissible in a public forum but are inherent and inescapable in the process of limiting a nonpublic forum to activities compatible with the intended purpose of the property. The touchstone for evaluating these distinctions is whether they are reasonable in light of the purpose which the forum at issue serves.

Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 49, 103 S.Ct. 948, 957, 74 L.Ed.2d 794 (1983); see also Good News Club v. Milford Cent. Sch., 533 U.S. at 106-07, 121 S.Ct. at 2100 ("The State may be justified in reserving [its forum] for certain groups or for the discussion of certain topics. The State's power to restrict speech, however, is not without limits. The restriction must not discriminate against speech on the basis of viewpoint, and the restriction must be reasonable in light of the purpose served by the forum.")(alteration in original)(internal citations and quotation marks omitted); Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. at 806, 105 S.Ct. at 3451 ("Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral."); Fund for Community Progress, Inc.

v. Kane, 943 F.2d at 138 (equating limited public forum with nonpublic forum and stating that "[if] properly characterized as limited public, exclusions are permitted so long as reasonable"). "The reasonableness standard is not a particularly high hurdle; there can be more than one reasonable decision, and an action need not be the most reasonable decision possible in order to be reasonable." Ridley v. Massachusetts Bay Transp. Auth., 390 F.3d at 90; accord Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. at 808, 105 S.Ct. at 3452 (noting that the "decision to restrict access to a nonpublic forum need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation").

The court evaluates the challenged rule of order, which prohibits nonresidents from speaking at the District's annual meeting while allowing residents to do so, "in light of the purpose of the forum and all the surrounding circumstances," Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. at 809, 105 S.Ct. at 3453; see also Berner v. Delahanty, 129 F.3d at 27 (same). As noted previously, the purpose of the District's annual meeting is for "the residents of the District [to] adopt a budget and tax rate for the upcoming year, elect officers to vacant positions, and vote on various resolutions governing the operation of the District and its fire department ...." Defendants' SUF ¶ 7. Defendants argue that the rule of order "flows from § 45-3-20 of the Rhode Island General Laws which requires the moderator to take a vote on pending issues 'after having heard **all of the electors** entitled to vote on the motion who desire to be heard[,]'" Defendants' S.J. Mem. at 3 (citing R.I. Gen. Laws § 45-3-20[17]) (alteration in original), "as well as

---

[17] Section 45-3-20 of the Rhode Island General Laws provides, in relevant part:

the Authorizing Act itself which speaks in terms of the authority of the District's residents to vote on specific motions at the annual meetings," id. (citing P.L. 1889 ch. 806).

"There is a significant governmental interest in conducting orderly, efficient meetings of public bodies." Rowe v. City of Cocoa, Florida, 358 F.3d 800, 803 (11th Cir. 2004); see also Kindt v. Santa Monica Rent Control Bd., 67 F.3d 266, 271 (9th Cir. 1995)(noting rent control board's "legitimate interest in conducting efficient, orderly meetings"); Collinson v. Gott, 895 F.2d 994, 1000 (4th Cir. 1990)(Phillips, J., concurring in judgment)("[D]isruption of the orderly conduct of public meetings is indeed one of the substantive evils that [government] has a right to prevent.")(second alteration in original)(citation and internal quotation marks omitted); Wright v. Anthony, 733 F.2d 575, 577 (8th Cir. 1984)(noting "significant governmental interest in conserving time and ensuring that others had an opportunity to speak" at public hearing). In Rowe v. City of Cocoa, Florida, the Eleventh Circuit upheld a residency requirement for speaking at city council meetings against First Amendment and Equal Protection challenges. 358 F.3d at 802 (holding that "the City Council's Rules of Procedure on their face are a permissible limitation of speech to non-residents at the limited public forum of a City Council meeting"). The court noted that the rules of procedure "set forth a structure intended to both hear members of the community and to move its meetings along," id. at 803, and "d[id] not impermissibly restrict speech," id. The court also observed that:

---

> The moderator of every town meeting shall, on a motion being made and seconded, relative to any business regularly before the meeting, after having heard all the electors entitled to vote on the motion who desire to be heard, cause the votes of the electors present to be taken on the motion.

R.I. Gen. Laws § 45-3-20 (1999 Reenactment).

> It is reasonable for a city to restrict the individuals who may speak at meetings to those individuals who have a direct stake in the business of the city--*e.g.*, citizens of the city or those who receive a utility service from the city--so long as that restriction is not based on the speaker's viewpoint.

Rowe v. City of Cocoa, Florida, 358 F.3d at 803; see also Kindt v. Santa Monica Rent Control Bd., 67 F.3d at 270 (noting that "public bodies must have a rather broad authority to structure meetings, even if that requires limiting subject matter and number and types of speakers")(citing City of Madison, Joint Sch. Dist. No. 8 v. Wisconsin Employment Relations Comm'n, 429 U.S. 167, 176-78, 97 S.Ct. 421, 427-28, 50 L.Ed.2d 376 (1976)(Stewart, J., concurring)). Other courts have upheld similar restrictions. See Eichenlaub v. Township of Indiana, 385 F.3d 274, 277, 281 (3rd Cir. 2004)(affirming denial of claim that claimant's First Amendment rights were violated by curtailing his speech during public meeting and removing him from meeting and noting that restricting discussion to topics of public, as opposed to private, concern served function of confining discussion to purpose of meeting); Make the Road by Walking, Inc. v. Turner, 378 F.3d 133, 148-150 (2nd Cir. 2004)(affirming exclusion of advocacy group from welfare office waiting room as reasonable in light of purpose of forum); Kindt v. Santa Monica Rent Control Bd., 67 F.3d at 271 (upholding regulations restricting public commentary to three minutes per item at end of each meeting as reasonable); White v. City of Norwalk, 900 F.2d 1421, 1422-23, 1425 (9th Cir. 1990)(affirming district court's rejection of First Amendment and equal protection challenge based on moderator's decision to rule speaker at city council meeting out of order and noting that council does not violate First Amendment by restricting speakers to subject at hand or by stopping speaker if speech becomes irrelevant or repetitious); Wright v. Anthony, 733 F.2d at 576-77 (affirming district court judgment that

enforcement of five minute time limit did not violate speaker's right to freedom of speech).

While Plaintiffs argue that "[w]hether the Defendants agree or not, it certainly is in the public interest for firefighters in the Anthony District to have access to and be heard at the financial meeting," Plaintiffs' Mem. at 4; see also Complaint ¶ 28 ("The Plaintiffs, as citizens and as firefighters, have a First Amendment right to speak publicly on matters of public interest."), it is clear that Mr. Gorman and Mr. Carlow did not have a right to speak at the December 9, 2003, annual meeting because they are not residents of, or voters in, the District. "The Constitution does not grant to members of the public generally a right to be heard by public bodies making decisions of policy." Minnesota State Bd. for Cmty. Colls. v. Knight, 465 U.S. 271, 283, 104 S.Ct. 1058, 1065, 79 L.Ed.2d 299 (1984); see also id. at 284, 104 S.Ct. at 1066 ("Policymaking organs in our system of government have never operated under a constitutional constraint requiring them to afford every interested member of the public an opportunity to present testimony before any policy is adopted."); Rowe v. City of Cocoa, Florida, 358 F.3d at 802 ("[T]he Supreme Court has established that the First Amendment does not guarantee persons the right to communicate their views at all times or in any manner that may be desired.")(citations and internal quotation marks omitted); Kindt v. Santa Monica Rent Control Bd., 67 F.3d at 269 ("Citizens are not entitled to exercise their First Amendment rights whenever and wherever they wish."). Plaintiffs' status as firefighters or, in the case of Mr. Carlow and James Perry, employees of the District, does not entitle them to be heard at the annual meeting. See Minnesota State Bd. for Cmty. Colls. v. Knight, 465 U.S. at 283, 104 S.Ct. at 1065 ("Appellees have no constitutional right to force the government to listen to their views. They have no such right as

members of the public, as government employees, or as instructors in an institution of higher education.").

The court finds that the rule of order prohibiting nonresidents from speaking at the December 9, 2003, annual meeting is reasonable in light of the purpose of the annual meeting. See Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. at 50-51, 103 S.Ct. at 958 ("The differential access provided PEA and PLEA is reasonable because it is wholly consistent with the district's legitimate interest in preserv[ing] the property ... for the use to which it is lawfully dedicated.")(alterations in original)(citation and internal quotation marks omitted). Plaintiffs, as nonresidents, were not entitled to vote on matters considered at the annual meeting. See id. (noting that rival educators' association, PLEA, did "not have any official responsibility in connection with the school district and need not be entitled to the same rights of access to school mailboxes"); see also Rowe v. City of Cocoa, Florida, 358 F.3d at 803 (finding it reasonable for a city to restrict speaking at meetings to those individuals who have a direct stake in the business of the city).

In addition, the rule of order is viewpoint neutral.

> The bedrock principle of viewpoint neutrality demands that the state not suppress speech where the real rationale for the restriction is disagreement with the underlying ideology or perspective that the speech expresses. A distinction is viewpoint based if it denies access to a speaker solely to suppress the point of view he espouses. The essence of viewpoint discrimination is not that the government incidentally prevents certain viewpoints from being heard in the course of suppressing certain general topics of speech, rather it is a governmental intent to intervene in a way that prefers one particular viewpoint in speech over other perspectives on the same topic.

Ridley v. Massachusetts Bay Transp. Auth., 390 F.3d at 82 (internal citations and quotation marks omitted); see also Berner

v. Delahanty, 129 F.3d at 28 ("The essence of viewpoint-based discrimination is the state's decision to pick and choose among similarly situated speakers in order to advance or suppress a particular ideology or outlook.").

"A bona fide residency requirement, as we have here, does not restrict speech based on a speaker's *viewpoint* but instead restricts speech at meetings on the basis of residency." Rowe v. City of Cocoa, Florida, 358 F.3d at 803-04. Here, notwithstanding Plaintiffs' claim that "the intent of the defendants was to stifle and intimidate the Plaintiffs and others from exercising their First Amendment rights to question or criticize Defendants' performance in their official capacities," Complaint ¶ 18, there is no evidence that the prohibition on nonresidents speaking was viewpoint based, see Berner v. Delahanty, 129 F.3d at 28 ("There is simply no basis in the complaint for an inference that ideology sparked the ... ban."); accord Make the Road by Walking, Inc. v. Turner, 378 F.3d at 151 ("[The plaintiff] has offered no evidence that [the defendant's] access policy was based on bias against its viewpoint rather than on preserving the Job Centers for their intended purposes."); Wright v. Anthony, 733 F.2d at 577 ("[T]here is no indication that [the defendant's] action was precipitated by the content of [the plaintiff's] message."); Tannenbaum v. City of Richmond Heights, 663 F.Supp. 995, 997-98 (E.D. Mo. 1987)("The record contains no indication, other than plaintiff's bare allegations, that the *content* of her remarks in any way motivated the enforcement of the ordinance against her."). Indeed, despite Plaintiffs' allegation to the contrary, see Complaint ¶ 20, there is no evidence that Plaintiffs even attempted to speak at the annual meeting. See Minutes at 1-8 (reflecting no attempt by Plaintiffs to speak at annual meeting); see also Burns Dep. at 16 (responding "I don't think so" when asked if Mr. Carlow attempted

to speak at the meeting); Defendants' SUF ¶¶ 18, 20, 22, 24 (stating that no Plaintiff identified himself as resident of, or voter in, District prior to start of 2003 annual meeting). Accordingly, there is no basis for the court to conclude that Mr. Gorman was ejected, and Mr. Carlow warned of ejection, based on what they might have intended to say. See Jones v. Heyman, 888 F.2d 1328, 1332 (11th Cir. 1989)("The substance of [the plaintiff's] views on the agenda item was thus never expressed. We decline to rule that his expulsion was based on disapproval of the content of his opinion in view of this fact."); see also Tannenbaum v. City of Richmond Heights, 663 F.Supp. at 997 ("The minutes of the April 1, 1985[,] meeting as well as the affidavits and depositions pertaining to this incident fail to show that plaintiff was kept from speaking, removed from the meeting or arrested because of the *content* of her message."). Moreover, Defendants observe that several residents of the District who were critical of the District's operation, policies, and/or officials, including Defendants, spoke at the 2003 annual meeting. See Defendants' SUF ¶ 15; Burns Aff. ¶ 5. Plaintiffs, again, have not disputed this statement.[18]

"A person's right to speak is not infringed when government simply ignores that person while listening to others." Minnesota State Bd. for Cmty. Colls. v. Knight, 465 U.S. at 288, 104 S.Ct. at 1068. The court concludes that the rule of order prohibiting nonresidents from speaking is viewpoint neutral and that Mr.

---

[18] The court notes, relative to Plaintiffs' contention that "inasmuch as the Fire District and Stanley Mruk personally have previously infringed upon the rights of at least one of the Plaintiffs ... [Defendants'] actions complained of herein are retaliatory," Complaint ¶ 19; see also Plaintiffs' Mem. at 5 (noting history between the parties), that Mr. Carlow's co-plaintiff in the prior federal court action, Lonnie St. Jean, see Mruk Dep., Ex. 1 (consent judgment in CA 02-538 ML), spoke several times during the December 9, 2003, annual meeting, see Minutes at 2, 3, 6, 8.

Gorman was ejected from the 2003 annual meeting not because of the content of his views but because he failed to obey the rules of order. See Eichenlaub v. Township of Indiana, 385 F.3d at 281 (stating that plaintiff was ejected from meeting for "the perfectly sustainable and content-neutral desire to prevent his badgering, constant interruptions, and disregard for the rules of decorum"); Kindt v. Santa Monica Rent Control Bd., 67 F.3d at 271 (noting that plaintiff "was not kept from speaking because of the content of his speech, but because he submitted chits for items that were not held open for public commentary until Item 13 on the agenda"); Jones v. Heyman, 888 F.2d at 1332 ("[T]he [defendant's] actions resulted not from disapproval of [the plaintiff's] message but from [the plaintiff's] disruptive conduct and failure to adhere to the agenda item under discussion."); Tannenbaum v. City of Richmond Heights, 663 F.Supp. at 997 ("[I]t appears that she refused to comply with a valid, content-neutral restriction on her speech. She was warned that she must comply, but she persisted in interrupting the meeting. Ultimately, she was removed from the meeting and arrested for failing to obey a valid ordinance. These facts do not as a matter of law make out a constitutional claim cognizable under § 1983 for violation of plaintiff's First Amendment rights."). The same is true of the warning to Mr. Carlow.

The court finds that the rule of order prohibiting nonresidents from speaking at the annual meeting is both reasonable and viewpoint neutral and that Plaintiffs have not alleged violation of a constitutional right. Therefore, the court need not proceed further with the qualified immunity analysis with regard to this issue. See Saucier v. Katz, 533 U.S. at 201, 121 S.Ct. at 2156.

**b. Prohibition on videotaping**

"This case presents an enigmatic question as to whether

members of the public have ... a federal constitutional right, guaranteed by the First Amendment ... to tape record a public meeting ...." Belcher v. Mansi, 569 F.Supp. 379 (D.R.I. 1983). Although Plaintiffs concede that "there is arguably no right to videotape governmental proceedings *per se* ...," Plaintiffs' Mem. at 3, they maintain that the rule of order prohibiting videotaping of the December 9, 2003, annual meeting except by members of the press violates their rights under the First Amendment, see id.

In Belcher v. Mansi, one of the plaintiffs sought to tape record a meeting of a community school committee. 569 F.Supp. at 380. The committee discussed a proposal banning electronic or mechanical taping of meetings of the school committee without the express knowledge and consent of the committee. Id. No action was taken initially, but a motion requiring the plaintiff to turn off his tape recorder passed. Id. Subsequently, the proposed policy was adopted. Id. Thereafter, the plaintiffs sued, challenging both the initial denial of permission to tape and the eventual policy prohibiting such taping without the committee's consent as violations of their rights under the First Amendment and the Rhode Island Open Meetings Act. See id. at 379, 381.

The Belcher court declined to decide the case on First Amendment grounds, concluding that the Open Meetings Act required the committee to allow members of the press and public to tape its meetings. See id. at 382 ("The court need not resolve these arcane [First Amendment] questions, however, as it concludes that resort to the Act will satisfy plaintiffs' initial claim."); see also Iacobucci v. Boulter, 193 F.3d 14, 24 (1st Cir. 1999)(noting that plaintiff had satisfied prerequisites under Massachusetts Open Meeting Law for videotaping public meeting). The Open Meetings Act, however, is inapplicable to the instant matter. See Pine v. McGreavy, 687 A.2d 1244, 1245 (R.I. 1997)(holding

that Open Meetings Act did not apply to a financial town meeting or town moderator who presided over such meeting). The Rhode Island Supreme Court stated that "[W]e are in agreement with the trial justice that a financial town meeting of the electors qualified to vote on the imposition of a tax and the expenditure of money does not fit within this definitional section [§ 42-46-2[19]]." Id.

Other courts have addressed the constitutional issue and have found that prohibitions on videotaping public meetings do not violate the First Amendment. See, e.g., Whiteland Woods, L.P. v. Township of West Whiteland, 193 F.3d 177, 184 (3rd Cir. 1999)(holding that restriction on videotaping planning commission meeting did not violate First Amendment); Johnson v. Adams, 629 F.Supp. 1563, 1564 (E.D. Tex. 1986)(holding as matter of law that First Amendment did not require that videotaping of commissioners court sessions be allowed); Csorny v. Shoreham-Wading River Cent. Sch. Dist., 759 N.Y.S.2d 513, 519 (N.Y. App. Div. 2003) ("[T]he First Amendment to the United States Constitution does not guarantee the right to videotape governmental meetings."); cf. Rice v. Kempker, 374 F.3d 675, 677-78 (8th Cir. 2004)(holding that Media Policy, which prohibited cameras or tape recording devices of any kind in witness area of execution room, did not

---

[19] Section 42-46-2 defines a public body as follows:

> (c) "Public Body" means any department, agency, commission, committee, board, council, bureau, or authority or any subdivision thereof of state or municipal government or any library that funded a majority of its operational budget in the prior budget year with public funds, and shall include all authorities defined in § 42-35-1(b). For purposes of this section, any political party, organization, or unit thereof meeting or convening is not and should not be considered to be a public body; provided, however[,] that no such meeting shall be used to circumvent the requirements of this chapter.

R.I. Gen. Laws § 42-46-2(c) (1999 Reenactment).

infringe on liberties protected by First Amendment). This Magistrate Judge finds these opinions persuasive.

In Whiteland Woods, L.P. v. Township of West Whiteland, the plaintiff, a real estate developer, asserted that its First and Fourteenth Amendment rights were violated by the defendant township's refusal to allow the plaintiff to videotape a meeting of the township planning commission. 193 F.3d at 178. The Whiteland Woods court declined to use public forum analysis in determining that restrictions on videotaping did not violate the First Amendment, noting that "[t]raditionally, the speech forum doctrine applies to 'expression' or 'speech' activity." Id. at 183 (citing Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. at 45, 103 S.Ct. 948). Instead, the court found that the plaintiff's right of access, specifically its right to receive and record information, was at issue. See id. at 182-83. The court had "no hesitation in holding [the plaintiff] had a constitutional right of access to the Planning Commission meeting ...." Id. at 180-81. The court noted, however, that "the public's right of access is not absolute," id. at 181, and that "the First Amendment does not require unfettered access to government information," id. at 182. The "critical question," id. at 183, according to the Whiteland Woods court, was "whether the restriction meaningfully interferes with the public's ability to inform itself of the proceeding; that is, whether it limits the underlying right of access rather than regulating the manner in which that access occurs," id. Finding that the plaintiff "ha[d] failed to demonstrate an essential nexus between the right of access and a right to videotape the Planning Commission proceedings," id. at 183-84, the court concluded that its "right of access to Planning Commission meetings did not create a federal constitutional right to videotape the meetings," id. at 184; see also Rice v. Kempker, 374 F.3d at 679 ("[C]ourts have

universally found that restrictions on videotaping and cameras do not implicate the First Amendment guarantee of public access.") (citing cases). The Whiteland Woods court, therefore, held that the plaintiff "ha[d] failed to demonstrate any deprivation of its First Amendment rights," 193 F.3d at 184.

Such is the case here. Clearly, Plaintiffs had access to the December 9, 2003, annual meeting. The inability of three of the four Plaintiffs to videotape the meeting did not in any way impact their right to be present at the meeting. See R.I. Gen. Laws § 45-3-26 ("All town meetings are open to the public, including representatives of the press and news media; provided[] that, in the event that there are space constraints, voters shall be admitted to the meetings before non-voters."). Indeed, the only Plaintiff to be removed from the meeting, Mr. Gorman, was not one of the three Plaintiffs who had brought video cameras. See Complaint ¶ 13 ("Plaintiffs James and William Perry and Robert Carlow brought video cameras to the meeting ...."). Thus, the court concludes that Plaintiffs' right of access to the District's 2003 annual meeting "was not meaningfully restricted by the ban on videotaping." Whiteland Woods, L.P. v. Township of West Whiteland, 193 F.3d at 183, and that they have failed to demonstrate any deprivation of their First Amendment rights, see id. at 184.

If the court were to utilize forum analysis, see Whiteland Woods, L.P. v. Township of West Whiteland, 193 F.3d at 182 (citing cases which analyzed prohibitions on recordings of public proceedings under public forum doctrine), the result would be the same. As noted previously, the parties agree that the annual meeting constitutes a limited public forum, see Discussion section II.B.2.a. supra at 25, which in the First Circuit is treated as a non-public forum, see Ridley v. Massachusetts Bay Transp. Auth., 390 F.3d at 76 n.4. Accordingly, the rule of

order prohibiting videotaping except by members of the press need only be reasonable and viewpoint neutral. See id. at 82.

Plaintiffs contend that "the distinction made by the Defendants here between press recordings and those made by the public cannot withstand legal scrutiny-they cannot pass the reasonableness test ...." Plaintiffs' Mem. at 3; see also id. at 2 (citing, inter alia, Branzburg v. Hayes, 408 U.S. 665, 684, 92 S.Ct. 2646, 2658, 33 L.Ed.2d 626 (1972)). However, it is not uncommon for the press to be accorded certain privileges not given to the public at large. For example, the First Circuit recognized that this court had, in a high-profile trial, "gone to great lengths to facilitate [media] access to the trial proceedings by, for example, reserving seats in the courtroom for members of the press ...." In Re Providence Journal Co., 293 F.3d 1, 16 (1st Cir. 2002); see also Huminski v. Corsones, 386 F.3d 116, 149 (2nd Cir. 2004)("[E]xclusion of identified individuals in pursuit of a greater flow of information to the public, for example, by preferring in some general way court admission for members of the 'press,' is likely to pass constitutional muster."); Putnam Pit, Inc. v. City of Cookeville, Tennessee, 221 F.3d 834, 840 (6th Cir. 2000)(noting that "some circumstances may dictate distinguishing journalists from the general public"). Given Mr. Burns' deposition testimony that he had a prior agreement with the press that they would not "irritate or interrupt anybody speaking at the meeting," Burns Dep. at 8, the court finds the distinction drawn between the press and members of the public by the rule of order to be reasonable.

Moreover, there is no evidence that the distinction made between the press and the public in the rule of order was viewpoint based. "A distinction is viewpoint based if it 'denies access to a speaker solely to suppress the point of view he

espouses.'" Ridley v. Massachusetts Bay Transp. Auth., 390 F.3d at 82 (quoting Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. at 806, 105 S.Ct. at 3451). In Belcher v. Mansi, the First Circuit was concerned because the policy disallowing videotaping without the express consent of the committee "cede[d] unbridled discretion to the Committee members to decide whether leave to record public meetings will be granted," 569 F.Supp. at 385, thereby "allow[ing] the Committee to deny the right to tape record based on the outlook of the person requesting permission to do so," id. As a result the court concluded that the committee's refusal to grant permission to the plaintiff "can be labeled accurately as a species of viewpoint-based discrimination," id. Here, however, no such concern is present. The rule of order applied equally to all members of the public, regardless of their viewpoint. Thus, there is no basis for the court to conclude that the rule of order targeted Plaintiffs because of their views.

The court concludes that the prohibition on videotaping by members of the public did not meaningfully restrict Plaintiffs' right of access to the December 9, 2003, annual meeting. Alternatively, the court finds the prohibition to be both reasonable and viewpoint neutral. In either case, Plaintiffs have not demonstrated a violation of a constitutional right and, therefore, the court need not proceed to the next prong of the qualified immunity analysis.

**Summary**

I recommend that, as to Chief Mruk, Defendants' Motion be granted and Plaintiffs' Motion be denied because there is no evidence, beyond Plaintiffs' bare allegations, that he took any actions against Plaintiffs at the December 9, 2003, annual meeting. I further recommend that, as to Mr. Burns, Defendants' Motion be granted and Plaintiffs' Motion be denied on the basis

of absolute legislative immunity or, alternatively, qualified immunity.

**Conclusion**

For the foregoing reasons, I recommend that Plaintiffs' Motion be denied and that Defendants' Motion be granted. Any objections to this Report and Recommendation must be specific and must be filed with the Clerk of Court within ten (10) days of its receipt. See Fed. R. Civ. P. 72(b); DRI LR Cv 72(d). Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district court and of the right to appeal the district court's decision. See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

David L. Martin

DAVID L. MARTIN
United States Magistrate Judge
March 10, 2006